Arthur NEWMAN et al., Plaintiffs-
Appellees,

v.

Howard M. STEIN et al., Defendants-
Appellees,

and

Morrie Benson and Rose Lerman,
Objectants-Appellants.

Nos. 855, 856, Dockets 72–1386, 72–1502.

United States Court of Appeals,
Second Circuit.

Argued June 9, 1972.

Decided June 29, 1972.

Abraham L. Pomerantz, New York
City. (William E. Haudek, Daniel W.
Krasner, and Pomerantz, Levy, Haudek

& Block, New York City, of counsel), for plaintiff-appellee Newman.

Charles Trynin, New York City, for plaintiff-appellee Goldberg.

Leibowitt, Milberg, Weiss & Fox, New York City, for plaintiff-appellee Silverman.

Stuart A. Jackson, New York City (John H. Carley, Frank J. Franzino, Jr., and Royal, Koegel & Wells, New York City, of counsel), for defendants-appellees, The Dreyfus Corp. and others.

W. Crosby Roper, Jr., and Covington & Burling, Washington, D. C., for defendant-appellee, The Dreyfus Fund Inc.

H. Richard Penn, Charles B. Salfeld, and Bachner, Tally & Mantell, New York City, for defendant-appellee Bachner.

Robert B. Levin, New York City (Bernard J. Coven, P. C., New York City, of counsel), for objectant-appellant Lerman.

Russell Troutman, P. A., Winter Park, Fla., for objectant-appellant Benson.

Before FRIENDLY, Chief Judge, and LUMBARD and MULLIGAN, Circuit Judges.

FRIENDLY, Chief Judge:

The Dreyfus Fund Incorporated (the Fund), a diversified open-end investment company registered under the Investment Company Act of 1940, is among the largest and has been one of the most successful mutual funds. The Dreyfus Corporation (the Corporation) has been its investment adviser, receiving for its services a fee at the annual rate of ½ of 1 percent of the average daily market value of the Fund's net assets. It has also been the Fund's principal underwriter, an activity for which it is paid by persons becoming stockholders in the Fund.[1] Until the transactions here at issue, all the stock of the Corporation was owned by Dreyfus & Co. (the partnership) a brokerage firm which is a member of the New York and other stock exchanges and, as the Fund's principal broker, earned very large commissions. On October 25, 1965, the partnership distributed the stock of the Corporation among its individual members.

This distribution of stock to the partners was the first step in a plan whereby 2,246,550 shares of the Corporation's stock, some 88% were to be sold to underwriters who, in turn, would make a public offering. Since the transaction would constitute the sale of a controlling block, the sale would be an "assignment," Investment Company Act § 2(a)(4), of the advisory and underwriting contracts, which, under the terms required for such contracts by § 15(a)(4) and (b)(2), would automatically terminate them. A special meeting of the stockholders of the Fund was called, on October 25, 1965, to approve a new management contract with the Corporation, substantially identical with the existing one, recommended by the Fund's directors, which would be effective after the assignment. In addition to explaining the reason for the new management contract, the proxy statement, mailed on October 5, 1965, stated that the board of directors of the Fund had approved a new underwriting contract, also substantially identical with the existing one, which would come into effect simultaneously with the new management contract.[2] The statement further ex-

---

1. A March 3, 1965, prospectus for the Fund's shares, introduced in the court below, states the sales charge as 8⅜% of the offering price, with a discount on that percentage available in certain large sales. At least during the period relevant in this case, the Corporation maintained no direct sales staff but only regional sales representatives who worked with local dealers. Accordingly, the income derived from the sales charge was divided between the Corporation and the local dealer, the former receiving ½ of 1%, the latter receiving the remaining 7⅞%. Thus, for example, in 1964 and the first half of 1965 the total commissions resulting from sales of the Fund's shares amounted to $10,464,949 and $8,336,454 respectively, with the Corporation's share being $617,898 and $491,546 respectively.

2. The apparent reason why the stockholders of the Fund were not asked to approve the new underwriting contract is that under

plained, *inter alia,* that the Corporation's and the Fund's methods of doing business would be essentially the same as theretofore; that the Corporation would continue to furnish the same investment personnel to the Fund, subject to normal turnover; that while, because of his membership in Dreyfus & Co., Jack J. Dreyfus, Jr., would not be eligible under the rules of the New York Stock Exchange to serve as an officer or director of the Corporation once it had become publicly owned, he would enter into a five year contract to render consulting services to the Corporation at an annual fee of $20,000 [3] and he would continue as Chairman of the Board and an Investment Officer of the Fund; and that the partnership was expected to continue as the Fund's regular broker. The sale was to be underwritten "upon terms which have not yet been determined." The selling shareholders had indicated they would invest in the Fund not less than 50% of the net proceeds after taxes. If the stockholders did not approve the new management contract or if no steps in the proposed plan of distribution were taken, the existing management contract would continue in force.

The stockholders of the Fund approved the new management contract by a vote of 91% of the shares represented, which constituted 70% of the outstanding stock. On October 27 the selling stockholders agreed to sell their shares to the underwriters at $18.625 per share. A prospectus, effective on the same date, fixed the sales price to the public at $20 per share.

In 1968, three stockholders of the Fund brought derivative actions in the District Court for the Southern District of New York to recover for the Fund the profit realized by the selling stockholders.[4] Pursuant to F.R.Civ.P. 42(a), these three actions were consolidated and ordered to proceed on a single amended complaint. The complaint asserted two theories—that the transaction constituted a sale of fiduciary office for personal gain, and that the proxy statement was materially misleading. After a trial devoted only to the latter claim since the facts with respect to the former were stipulated, this court handed down its decision in Rosenfeld v. Black, 445 F.2d 1337 (2 Cir. 1971), holding that profits realized by a retiring investment adviser of a fund from the successor it had caused to be installed were recoverable by the fund; to say the least, this gave considerable aid and comfort to plaintiffs' sale of office claim. Shortly thereafter the parties executed a stipulation of settlement, subject to court approval, for $5,000,000. After a hearing Judge McLean approved the settlement, see [1971–72 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 93,316, at 91,718 (1971). Two stockholders of the Fund who opposed the settlement as inadequate have appealed from the order thereafter entered.

As we recently pointed out in Saylor v. Lindsley, 456 F.2d 896, 904 (2 Cir. 1972), the role of a court in passing upon the propriety of the settlement of a derivative or other class action is a delicate one. Quoting from an article by a member of the firm representing one of the plaintiffs in this action,[5] we recog-

---

§ 15(b) (1), unlike § 15(a) (2), approval by the board of directors suffices.

3. The evidence was that, due to poor health, Mr. Dreyfus, over the period 1961–1965, had gradually relinquished day-to-day supervision of the investment management program to Howard M. Stein and the men Mr. Stein had selected to assist him. In fact, this shifting of responsibilities was largely completed at least two years before the public distribution of the Corporation's stock.

4. These were: Newman v. Stein, et al., 68–Civ.–1398; Goldberg v. The Dreyfus Corporation, et al., 68–Civ.–2924; Silverman v. Rogers, et al., 68–Civ.–2982. In 1969, objector Lerman instituted a fourth action in the Southern District on behalf of the Fund: Lerman v. Dreyfus, et al., 69–Civ.–1786. This was not consolidated with the other actions.

5. Haudek, The Settlement and Dismissal of Stockholders' Actions—Part II: The Settlement, 23 Sw.L.J. 765 (1969).

nized that since " '[t]he very purpose of a compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation', the court must not turn the settlement hearing 'into a trial or a rehearsal of the trial'." Rather, in the words of the Supreme Court, Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424–425, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968),[6] it must reach "an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated" and "form an educated estimate of the complexity, expense, and likely duration of such litigation . . . and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." See also In re Prudence Co., 98 F.2d 559, 560 (2 Cir. 1938), cert. denied, Stein v. McGrath, 306 U.S. 636, 59 S.Ct. 485, 83 L.Ed. 1037 (1939); West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079, 1086 (2 Cir.), cert. denied, Catler Drugs v. Chas. Pfizer, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). We have also said, citing many cases, "that the approval of a compromise is a discretionary order which can be reversed only upon a clear showing of an abuse of discretion," Connecticut Ry. & Lighting Co. v. New York, N. H. & H. R. R., 190 F.2d 305, 308 & n. 3 (2 Cir. 1951); see Upson v. Otis, 155 F.2d 606, 612 (2 Cir. 1946); West Virginia v. Chas. Pfizer & Co., supra, 440 F.2d at 1085, although the reasons for invoking this accordion-like principle in the context of settlements of stockholders' derivative suits do not seem altogether clear.[7] As said in Protective Committee v. Anderson, supra, 390 U.S. at 434, 88 S.Ct. at 1168, "[i]t is essential . . . that a reviewing court have some basis for distinguishing between well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors, and mere boilerplate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law." Thus, appellate courts have rejected approval of settlements where the trial court acted without sufficient facts concerning the claim, see, e. g., Ashbach v. Kirtley, 289 F.2d 159, 163–166 (8 Cir. 1961), or failed to allow objectors to develop on the record facts going to the propriety of the settlement, see, e. g., Cohen v. Young, 127 F.2d 721, 725–726 (6 Cir. 1942).[8] Similarly, clear error with respect to the law governing a defendant's liability may warrant reversal

6. *TMT Trailer Ferry* involved judicial approval of compromises in a Chapter X bankruptcy proceeding rather than of the settlement of a stockholder's derivative action. However, decisions in the one area have at times been cited in the other. Compare, e. g., Upson v. Otis, 155 F.2d 606, 614 (2 Cir. 1946) (bankruptcy decisions cited in context of stockholders' derivative action); Saylor v. Lindsley, *supra*, 456 F.2d at 904 (same); Schleiff v. Chesapeake & O. Ry., Co., 43 F.R.D. 175, 178 (S.D.N.Y.1967) (same), with, e. g., Ashbach v. Kirtley, 289 F.2d 159, 163 (8 Cir. 1961) (stockholder action decisions cited in context of bankruptcy proceeding); Wolf v. Nazareth Enterprises, Inc., 303 F.2d 152, 155 (2 Cir. 1962) (same).

7. One basis, at least where the district court had granted approval, might be that the policy favoring settlement is so strong that opposition should be made difficult. Another might be that, generally speaking, one judicial examination of an agreed disposition should suffice. However, there are opposing considerations in derivative or other class actions. See Saylor v. Lindsley, *supra*, 456 F.2d at 900–901. A partial explanation may lie simply in the influence of decisions revewing approval of compromises in bankruptcy proceedings, see note 6, although the difference in the interest of a trustee from that of a plaintiff in a class action tends more strongly in favor of limited court of appeals review in such cases, especially when a district judge has approved the approval of a referee.

8. Also, essentially procedural flaws, such as inadequate class notice of settlement, cf. Pittston Co. v. Reeves, 263 F.2d 328 (7 Cir. 1959), or inadequate attorney-client communication concerning the settlement, see Saylor v. Lindsley, *supra*, 456 F.2d 896, may undercut the integrity of the settlement process.

of the trial court's approval of a settlement. See Upson v. Otis, *supra,* 155 F. 2d 606. But there is no problem here in these respects. The settlement occurred only after the completion of a full trial and neither objector has complained that the district judge subsequently prevented development of any further facts relevant to the settlement. As to matters of law, this appeal raises questions reflecting at most, as we shall see, uncertainty in the law, a factor which normally commends a compromise to a trial judge's discretion, see, e. g., In re Prudence Co., *supra,* 98 F.2d at 560. Beyond these specific considerations, very likely all that is meant when appellate courts speak of the trial judge's discretion in this context is that in any case there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion—and the judge will not be reversed if the appellate court concludes that the settlement lies within that range.

Appellants arrive at their figure of potential recovery as follows: The net proceeds of the sale were $41,326,933.75. The share of the selling stockholders in the $6,783,833 net assets of the Corporation as of June 30, 1965, was $5,-969,773.04. Deduction of this leaves $35,357,160.71.[9] Appellants contend that a settlement for only one-seventh of that amount is so small as to fall below the lowest point in the range of reasonableness. Although at first blush the argument is not unpersuasive, we reject it on the facts of this case.

■ The district court dealt first with the claim that the proxy statement was false and misleading in a material respect. The principal claim in that regard was that the statement failed to give any information about the price the selling corporation stockholders would realize.[10] Conceding that precision in the proxy statement would not have been possible, since the price was not firmly fixed until the evening before the sale,

9. A brief submitted on behalf of one of the directors of the Fund suggests that the maximum recovery would be only the net proceeds (less the share of net assets) realized by the *controlling stockholders* of the Corporation rather than by all selling stockholders. This was not considered by the district court, probably because the *partnership* had controlled the Corporation until two days before the sale and it would defy reality to make anything turn on the two days ownership by individual partners. We likewise do not consider whether the argument might have force in a case where minority holders joined with the holders of a controlling block in making a sale.

10. The only other claim defined in the pretrial order was that the statement did not make clear that, after the Corporation had gone public, the Fund would no longer have an opportunity to induce the partnership to apply brokerage commissions from the Fund in reduction of the management fee. This is so obvious as not to require statement; moreover, the evidence was that the Fund had never attempted this up to the time of the public distribution of the Corporation's stock. At argument in this court appellants added some

other claims: (1) that the proxy statement failed to state that the sale would effect a termination of the management contract, (2) that it did not sufficiently apprise stockholders that the Fund could avail itself of termination to negotiate a new contract on better terms or with a different investment adviser, and (3) that it did not inform the stockholders that the Fund would (or might) be entitled to recover any profits. Even assuming these claims to be still open despite the pretrial order, we find them without merit. The first point was sufficiently disclosed although not stated in so many words; indeed, this was what the meeting was all about. On the face of things the Fund did not have an opportunity to negotiate since the selling stockholders of the Corporation took the position that unless the Fund approved the new contract, they would continue with the existing one—although one may harbor reasonable doubt whether this position would have been maintained if determined opposition had developed. Apart from other considerations, the third point would have required the draftsman of the 1965 proxy statement to anticipate our *Rosenfeld* decision six years later.

which was after the meeting of the Fund's stockholders, appellants say the statement could have given some notion of what the sellers contemplated, and, more specifically, that it could and should have been amended after October 13, when the principal underwriters reached an agreement with the selling shareholders that the price to the public would be in a range of $20 to $21 per share. While we tend to agree that more information could and should have been given, we doubt that a court would find the proxy statement omitted "to state any material fact necessary in order to make the statements therein not false or misleading," SEC Rule 14a–9(a), so as to support a recovery. The financial statements of the Corporation which were annexed to the proxy statement showed that the Corporation had earned 61 cents per share in 1964 [11] and 44 cents per share in the first half of 1965.[12] It required no great acumen for a shareholder in the Fund to understand that the selling shareholders were not going to part with such valuable shares at their net asset value of $2.66. The stockholders of the Fund were thus put on notice of the essential point that the sellers expected to realize proceeds considerably in excess of net asset value; if they had wished more nearly precise figures, they could have inquired. We thus agree with the district court that if the proxy statement had been the sole issue, the case would not have been settled except perhaps for its nuisance value, and that no significant fraction of the $5,000,000 settlement must be allocated to this claim.

On the other hand, the appellees, both defendants and plaintiffs, acknowledge that the claim with respect to the sale of fiduciary office was a substantial one;

indeed, the defendants have acknowledged it to the tune of $5,000,000, no paltry sum. The arguments why so substantial a difference between this and appellants' figure of a maximum potential recovery of $35,000,000, can be justified may be divided into two principal categories: One concerns the continuing viability of Rosenfeld v. Black; the other consists of an asserted distinction of it and of arguments relating to the measurement of the profits realized.

The viability considerations also divide themselves into two sub-categories —judicial and legislative. While it would ordinarily be presumptuous for us to predict that the Supreme Court would ultimately deem an issue deserving of the grant of certiorari, we cannot disagree with experienced counsel for plaintiffs-appellees, or with the district judge who approved a settlement in the Rosenfeld case itself, 336 F.Supp. 84, 88 (S.D.N.Y.1972) (Gurfein, J.), that this is an issue where certiorari almost surely would have been granted to review a plaintiffs' judgment in this action, unless some other case had preceded it.[13] Although we distinguished the decision in SEC v. Insurance Securities, Inc., 254 F.2d 642 (9 Cir.), cert. denied, 358 U.S. 823, 79 S.Ct. 38, 3 L.Ed.2d 64 (1958), on what we believe to be a sound ground, 445 F.2d at 1346, we recognized our disagreement with "passages in the [Ninth Circuit's] opinion suggesting that in the court's view none of the excess of the price received by the controlling stockholders over the book value of their stock would be recoverable under any circumstances by stockholders of the investment company." Id. The importance of this conflict in approach has been heightened by the degree to which management companies, perhaps engag-

11. As against 17 cents per share in 1960 and 37 cents in 1964.

12. As against 27 cents in the first half of 1964.

13. Although a protective application for certiorari was filed in Rosenfeld, see 40 U.S.L.W. 3289 (U.S. Dec. 21, 1971) (No. 71–771), it has presumably not been press-

ed since the case was settled with the approval of the district court, 336 F.Supp. 84. The pending appeal from that decision does not involve the propriety of approval but only whether stockholders of the fund who had redeemed their shares subsequent to the transfer of the advisory office may participate in the proceeds.

ing in some wishful thinking, had relied on what the Ninth Circuit said in *Insurance Securities* rather than on what it decided. Beyond this, *Rosenfeld* has attracted what for us is an almost unparalleled amount and variety of comment in legal journals.[14]

If certiorari were granted, we would, of course, hope to have our view affirmed. But Plautus warned long ago "what a ticklish thing it is to go to law," and the ticklishness does not diminish as the pinnacle is reached. Here we have the further imponderable, developed *infra*, whether the SEC might appear as *amicus curiae* and ask that the decision against it in the *Insurance Securities* case should be adopted as the governing rule and the effect which such a representation might have upon the Supreme Court. Cf. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

The threat on the legislative side may be greater still. Within a few months after the *Rosenfeld* decision, the Chairman of the SEC was quoted as saying that although the opinion was "well rea-

soned and well grounded on basic principles of fiduciary law," it was "harsh on people who are in the business [of advising investment companies] and it may call for legislative redress." [15] Encouraged by this, the Investment Company Institute (ICI) sent to the Senate a bill that would add a new subsection to § 15 of the Investment Company Act as follows:

(f) No person shall be subject to any liability in any action or proceeding commenced prior to or on or after the date of the enactment of this subsection on the basis that such person has paid or received payments or profits in connection with a transaction *after April 7, 1958* whereby an interest in an investment adviser to a registered investment company has been or shall be sold or otherwise transferred or whereby any third person succeeded or shall succeed to any relationship between such adviser and such investment company, except to the extent that any terms, conditions or understandings, express or implied, in connection with such payment or

---

14. See, e. g., Butowsky, Fiduciary Standards of Conduct Revisited—Moses v. Burgin and Rosenfeld v. Black, 17 N.Y.L. Forum 735, 752–66 (1971); Nutt, A Study of Mutual Fund Independent Directors, 120 U.Pa.L.Rev. 179, 202–05, 242–46 (1971); Keeffe, "Undivided Loyalty" Prescribed for Mutual Fund Managers, 58 A.B.A.J. 209 (1972); Note, Fiduciary Requirements and the Succession Fee Upon the Change of Mutual Fund Advisers, 85 Harv.L.Rev. 655 (1972); Note, Mutual Fund Control-Transfer Profits: Congress, the SEC, and Rosenfeld v. Black, 58 Va.L.Rev. 371 (1972); Comment, Duties of the Independent Director in Open-End Mutual Funds, 70 Mich.L.Rev. 696, 724–27 (1972); The Second Circuit Review, 38 Brooklyn L. Rev. 909, 1225 (1972); Second Circuit Note [1970 Term], 46 St. John's L.Rev. 405, 531 (1972); 40 Geo.Wash.L.Rev. 312 (1971); 46 N.Y.U.L.Rev. 1029 (1971); 40 Fordham L.Rev. 997 (1972); 60 Geo.L.J. 825 (1972); 50 Texas L.Rev. 583 (1972); 41 U.Cinn.L.Rev. 244 (1972). While there has been little disagreement with the imposition of fiduciary status upon the investment

adviser with respect to the sale of his office, but see 50 Texas L.Rev. at 588–89, a substantial amount of discussion has concentrated on tempering the prohibition on gain from such sales either by defining the standard of fiduciary duty as less than absolute or by allowing various defenses to be set up, some consideration of the "fairness" of the transaction generally being the focal point in either case. See Note, *supra*, 58 Va.L.Rev. at 407–16; 40 Geo.Wash.L.Rev. at 319–20; 46 N.Y.U.L.Rev. at 1039–44; 60 Geo.L.J. at 835–37; 41 U.Cinn.L.Rev. at 249–50. Beyond the standard of liability, the question of the proper measurement of the adviser's gain from the sale of his office, an issue not directly before us in *Rosenfeld* has also received significant consideration. See Butowsky, *supra*, 17 N.Y.L. Forum at 763–65; Note, *supra*, 85 Harv. L.Rev. at 664–65; Note, *supra*, 58 Va. L.Rev. at 415 n.216; 50 Texas L.Rev. at 587–88.

15. N.Y. Times, Sept. 12, 1971, § 3, at 3, col. 1 & at 14, col. 4, quoted in Brief for Plaintiffs-Appellees at 10–11.

receipt have imposed or shall impose an unfair burden on the investment company.[16] (Emphasis added)

While expressing some doubts about the terms of this amendment, the SEC, on March 10, 1972, advised Senator Williams that it intended shortly to recommend legislation that "would permit an investment adviser and its owners to obtain compensation, including profit, in connection with transactions which result in an assignment of an advisory contract if certain conditions are met." BNA Sec.Reg. & L.Rep., No. 146, at I–1 (April 5, 1972). If the SEC and the ICI should join forces,[17] it is not clear just who would take up the cudgels in favor of "basic principles of fiduciary law." Indeed, even if the SEC's recommended legislation were to operate only *in futuro,* as its reference to conditions giving some safeguards to shareholders may imply, it is not hard to envision a combination of such legislation for the future and the ICI's bill for the past; the watering down of the SEC's previous reform proposals concerning mutual funds,[18] after four years of struggle in Congress, Pub.L. No. 91–547, 84 Stat. 1413 (1970), is a vivid demonstration that its recommendations, when confronted by industry opposition, are not likely to emerge from Congress at the same strength with which they entered. While a retroactive provision would hardly affect a judgment that had become final, continued prosecution of this action would have afforded the selling stockholders and other management companies a powerful impetus to get such legislation on the books before the inevitable appellate process had been concluded.

Counsel for appellants has deftly pointed out, though, that the stipulation of settlement in this case was signed on July 9, 1971, some two months before the Chairman of the SEC gave any public indication of the Commission's position following *Rosenfeld.* It is argued that without this strong encouragement the ICI proposal which, it is suggested, had in fact been "kicking-around" for a number of years did not pose a serious threat to the *Rosenfeld* decision and that the possibility of legislative action was therefore not a real consideration *at the time* the stipulation was signed. In retrospect it is impossible to determine precisely what role the ICI proposal alone properly played in the parties' original decision to settle. Even if the proposal had been "kicking-around" for some time without generating much interest, *Rosenfeld* suddenly provided the industry with a significant stimulant to action which had theretofore been lacking, given the *Insurance Securities* decision —a fact of which the parties were undoubtedly cognizant at the time they signed the stipulation. In any event, evaluation of the propriety of a settlement requires realistic consideration of facts which affect the ultimate likelihood of success, and it would be inappropriate for a reviewing court to freeze matters as of the moment at which the parties entered into an agreement and ignore subsequent developments which either reinforce or undermine the original decision to settle. Compare System Meat Co. v. Stewart, 183 Neb. 698, 163 N.W.2d 789, 792 (1969).

Turning to the second category of arguments, an asserted distinction between this case and *Rosenfeld* and questions relating to the measure of damages, we wish to make crystal-clear that our observations do not connote either approval or disapproval. We refer to these points only as arguable ones that would merit consideration, without indicating

---

16. April 7, 1958, was the date of the *Insurance Securities* decision by the Ninth Circuit.

17. Counsel for plaintiffs-appellees referred to this at argument as "an extraordinary item on the American scene."

18. Report of the Securities and Exchange Commission on the Public Policy Implications of Investment Company Growth, H.R.Rep. No. 2337, 89th Cong. 2d Sess. (1966).

any view what the result of such consideration should be:

(1) Defendants-appellees say that this case differs from *Rosenfeld,* and also from a case like *Insurance Securities* where holders of a controlling block sold to another group that supplanted them in the management of the adviser, in an essential way. This is that, from a practical rather than a legalistic frame, there was here no "termination" of an investment adviser but rather a provision for continuation of the one that had operated so successfully in the past. Thus, the proxy statement sent to the Fund's stockholders asserted in part that "[t]he Corporation's proposed method of doing business, assuming the adoption of the new management contract and underwriting contract, will be essentially the same as at present." In other words, while the Corporation's stockholders sold their stock at a profit, the argument is that they did not in reality sell their office.[19] In further support of this, defendants-appellees point to the item in the proxy statement wherein the Fund's stockholders were informed that if they did not approve the proposed public offering, the Corporation would continue as theretofore.

(2) [20] *Rosenfeld* dealt with a company whose sole continuing activity vis-a-vis the fund was as an investment adviser, since, unlike most open-end funds, shares were not currently offered. Here the Corporation was both investment adviser and principal underwriter. Our holding of a fiduciary relationship between an investment adviser and the fund would not necessarily entail a similar holding with respect to an underwriter, whose compensation does not come from the fund and whose activity does not directly affect the money invested by the fund's shareholders. Some 17% to 18% of the Corporation's after tax income in 1964 and the first half of 1965 was estimated to have come from distribution activities. Arguably an equivalent proportion of the "profits" should be deducted.

(3) Since *Rosenfeld* came before us on appeal from a summary judgment dismissing the complaint, we were not obliged to determine how the profit of the retiring adviser should be measured. However, we noted, 445 F.2d at 1346 n. 12, law review comments concerning "[s]ome difficulties in applying the principle prohibiting profit in the transfer of the advisory office to the sale of controlling stock in a corporate investment adviser" and arguing "that the amount of unjust enrichment may be less when the same adviser is expected to continue," without taking any position thereon.

Defendants-appellees argue that, quite apart from its power over stockholder choice, the Corporation had a value greater than its net assets, predominantly cash, marketable securities, and receivables from dealers, listed in its balance sheet. With its impressive record of performance, the Corporation would have had little difficulty in forming a new fund or in selling its services to existing ones or to other institutional investors. Although the value deriving from this potential would hardly have been as great as the capitalization of the Corporation's earnings as adviser to a fund which had grown to some

19. An argument against this is that the price paid for the stock would inevitably figure in any efforts to reduce the management fee. The proxy statement noted that "[t]he Fund is the only mutual fund of its size which pays a management fee which does not decline with respect to increments of net assets above a base amount." But the Corporation would naturally be even more reluctant than previously to a change in terms that would substantially reduce the earnings that had been disclosed to those who had bought the stock at $20 per share, even though the prospectus had properly advised of the short duration of the management and underwriting contracts.

20. This point, while not raised by appellees, seems worthy of note subject to the general caveat expressed above.

$937,400,000 in net assets as of mid-1965 and had paid $2,290,203 in management fees in the first six months of 1965, the Corporation, even after termination of its contracts with the Fund, would be worth something more than the figure shown in the balance sheet. Going beyond this, we encounter more extensive but less persuasive "going concern" value theories, ranging from the suggestion that account should somehow be taken of the likelihood of future renewals simply on the basis of performance and without regard to the Corporation's influence on the board of directors and control of the proxy machinery [21] to the extreme that the stock necessarily was worth what the underwriters were willing to pay, with the inevitable corollary that there could never be a profit on the sale of a controlling block.

When all these dubieties are considered in combination, as they must be, it becomes apparent that appellants' picture of a practically assured recovery of $35,000,000 lacks reality. The $5,000,000 settlement may not have been a brilliant one for the plaintiffs—a question only time can resolve. However, with all relevant factors being taken into account, as the district judge did, we cannot say that the settlement fell below the lowest point in the zone of reasonableness.

The judgment is affirmed. Since we believe appellants have performed a useful service in bringing this matter before us, each party will bear its own costs.

---

21. It is not clear how such a prognostication could reflect the possibility of reductions in the Corporation's fee at the insistence of the Fund's board of directors, see § 15(c), or by litigation, now somewhat facilitated by § 15(c) and by § 36(b), added by Pub.L.No. 91–547, 84 Stat. 1428 (1970). Indeed, the phenomenon of numerous sales of management companies (or of controlling blocks) or the substitution of a new adviser (as in *Rosenfeld*) at substantial multiples of existing fees, including cases where the adviser's performance had been in no way

outstanding, casts doubt on a fundamental premise of the Investment Company Act, namely, that shareholders of mutual funds are significantly protected by the requirements of § 15(a) for contract renewals every two years. The SEC Mutual Fund report stated that, even when there is a change in management, "[t]he Commission knows of no instance where fund shareholders have rejected a new advisory contract proposed by their managers in connection with a sale by them of the management organization." *Supra* note 18, at 150. See also *id.* at 125–43.