Claire SCHLUSSELBERG, Trustee Under Agreement Dated October 1, 1959 f/b/o Carol Sands, et al.

v.

COLONIAL MANAGEMENT ASSOCI-ATES, INC., et al.

Civ. A. No. 71-1052-F.

United States District Court, D. Massachusetts.

Oct. 17, 1974.

Harvey A. Silverglate, Boston, Mass., for plaintiffs.

George T. Finnegan, Ropes & Gray, Laurence M. Johnson, Nutter, McClennen & Fish, Christian M. Hoffman, Foley, Hoag & Eliot, Boston, Mass., for defendants.

## OPINION

FREEDMAN, District Judge.

A proposed settlement of a consolidated shareholders' derivative suit, originally brought on behalf of nominal defendant Colonial Equities, Inc. by plaintiff Schlusselberg, came before the Court on August 26, 1974 for its approval pursuant to Federal Rule of Civil Procedure 23.1. After extensive discovery, the Colonial Fund, Inc., Colonial Growth Shares, Inc., and Colonial Ventures, Inc.,[1] (hereinafter referred to as "the Funds"), all of which are managed by defendant Colonial Management Associates, Inc., (hereinafter referred to as "the Adviser"), have joined with the original derivative plaintiff as parties plaintiff. Accordingly, the terms of the proposed settlement bestow benefits upon all of these Adviser-managed Funds.

In addition to the Adviser and the nominal defendant, Colonial Equities, Inc., various other parties are currently listed as defendants. These parties include State Mutual Life Assurance Company of America (hereinafter referred to as "State Mutual"); S. M. A. Management Corp., (hereinafter referred to as "S. M. A."), a wholly-owned subsidiary of State Mutual; the thirteen individual selling shareholders of the Adviser; and other individuals who either are or were officers of State Mutual while holding positions with either the Adviser and/or one or more of the Funds.

---

1. All of the Funds are open-end management investment companies ("mutual funds") registered pursuant to the Investment Company Act of 1940, 15 U.S.C. § 80a–1 et seq. (hereinafter referred to at times as "the Act").

Stockholder derivative suits invariably involve large sums of money.[2] Furthermore, when the Court is called upon to give its blessings to a settlement of this type of action, the factual and mathematical criteria upon which the Court bases its decision can rarely be reduced to precise and certain terms. This case is not an exception to either of the above statements. Nevertheless, "[a]pproval should be given if the settlement offered is fair, reasonable, and adequate . . . The most important factor is the strength of the case for the plaintiffs on the merits, balanced against the amount offered in settlement. This factor is sometimes referred to as the likelihood of success." West Virginia v. Chas. Pfizer & Co., 314 F. Supp. 710, 740 (S.D.N.Y., 1970). Thus the Court, cognizant of the legal standards, the high stakes, and the imprecision of its endeavor, proceeds to evaluate the settlement.

### The Proposed Settlement

The proposed settlement can be summarized as follows:

1. The Adviser's 13 individual selling shareholders will deposit $1,000-000 with an escrow agent to be paid to the Funds subject to escrow agent fees and court allowed attorney fees.

2. The Adviser will, subject to the approval of the shareholders of each of the Funds, enter into new advisory agreements with the Funds.

3. The Funds are to receive, over a period of ten years, a total credit of $1,700,000 against their advisory fees payable to the Adviser. The credits are to be effective in increments of $42,500 per fiscal quarter. If the quarterly credit reduction to the advisory fee payable by a Fund to the Adviser for any fiscal quarter causes the net advisory fee to fall below a stated minimum amount, a formula is provided whereby State Mutual will share with the Adviser a portion of the cost of effectuating the fee reduction. State Mutual will also guarantee payment to any Fund whose advisory contract with the Adviser is terminated or whose stockholders fail to approve the essentials of the new agreements made pursuant to the Stipulation of Settlement.

4. The Adviser, as long as it is the investment adviser to any of the Funds during the ten-year period in which the Funds are to receive advisory fee credit reductions, will use its best efforts to continue to maintain its status as a preferred rate non-member of both the Boston and Pacific Stock Exchanges.

5. The settlement, if approved, will dismiss with prejudice all claims asserted or which could have been asserted in this action. The defendants will also be released from any further liability in connection with the claims.

* * * * * *

The original complaint filed in this case alleged numerous claims against the defendants. Yet the third amended and consolidated complaint contains but two counts. Although the claims that were ultimately withdrawn by the plaintiffs may have had a bearing on the negotiations leading to the proposed settlement, the Court assumes that discovery led to a realization that these claims had no basis in fact. Therefore, in evaluating this settlement, the Court will consider only the merits of the two counts in the third amended and consolidated complaint.

### Count I

Count I, based upon this Circuit's decision in Moses v. Burgin, 445 F.2d 369 (1st Cir., 1971), aff'ing in part and rev'ing in part, 316 F.Supp. 31 (D.Mass., 1970), cert. den. 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed.2d 547 (1971), alleges that

---

2. The amount claimed in damages in this case is approximately $24.5 million dollars.

the Adviser was, or should have been, aware of various opportunities to "recapture" portions of brokerage commissions known as "give-ups"[3] and that the Adviser failed to inform the Funds' unaffiliated directors of these opportunities, thereby violating the Adviser's fiduciary obligation to the Funds. This failure to inform allegedly deprived the Funds of opportunities to reduce either their brokerage or management costs.

In *Moses,* the Court of Appeals recognized, for discussion purposes, two methods calculated to "recapture" assets for the benefit of a mutual fund. Applied to the facts of this case, the first method, known as "NASD recapture," involves the proposed paying of a give-up by the executing broker of a portfolio transaction to the Adviser's wholly owned subsidiary, Colonial Distributors, Inc.,[4] (hereinafter referred to as "the Distributor") which was a member of the National Association of Securities Dealers, Inc. The give-up to the Adviser-owned Distributor would be credited against the advisory fee paid by a Fund to the Adviser. This practice was condoned on the Pacific and the Philadelphia-Baltimore-Washington stock exchanges despite their anti-rebate rules until December 5, 1968, at which time it was universally abolished.

The second method of recapture discussed in Moses v. Burgin, *supra,* known as "broker affiliation," would have the Adviser, or its subsidiary Distributor,

becoming a broker-dealer on a stock exchange. As a broker-dealer, the Adviser would be able to execute portfolio transactions, thereby eliminating the need for an independent broker-dealer. The commissions paid by the Funds on these transactions would be refunneled back to the Funds directly or set off against the advisory fee.

In Marcus v. Putnam, *supra,* 60 F. R.D. at 446, this Court, referring to the decision in *Moses,* stated that "the investment adviser and underwriter have a duty to disclose to the directors of the fund the possibility of recapturing portions of these brokerage commissions for the direct benefit of the fund." Yet this duty to disclose has meaning only in light of the applicable legal standard used in evaluating this duty. That standard can be found in the pre-1970 wording of Section 36 of the Investment Company Act of 1940 (15 U.S.C. § 80a–35) which holds a fiduciary liable if he is guilty of " . . . gross misconduct or gross abuse of trust . . ."[5] Thus the issue that would have confronted the Court absent the settlement is whether the defendants' failure to disclose to the Funds' unaffiliated directors the possibility of recapturing assets amounted to "gross misconduct or gross abuse of trust."

It is difficult for the Court to perceive how the plaintiffs could have carried the day on this issue. The directors of the Funds were advised early

---

**3.** " 'Give-ups' are those portions of a stockbroker's commission resulting from the funds' own portfolio transaction which are paid over to brokers [not partaking in the portfolio transaction itself] who have sold shares of the funds to the public. The give-ups are awarded to brokers in proportion to their success in selling and help to stimulate sales. Through the use of give-ups, the funds and the existing shareholders assume part of the cost of the sales process; and, as a result, the net income from selling new shares is less than asset value. Whereas, if the fund can . . . [recapture] the give-ups for its own benefit, the fund will receive the full asset value from the sale of its shares." Marcus v. Putnam, 60 F.R.D. 441, 446, n. 2 (D.Mass., 1973).

See Moses v. Burgin, *supra,* 445 F.2d at 372, 374.

**4.** The Distributor functioned as underwriter and distributor of the shares of the Funds. It was merged into the Adviser on October 30, 1973. Since that date, the Adviser has assumed the Distributor's previous operations.

**5.** Although Section 36 was amended on December 14, 1970 to find liability based upon " . . . any act or practice constituting a breach of fiduciary duty involving personal misconduct . . .," the complaint in this case was filed before the date of that amendment. Consequently, the pre-amendment standard must be used.

in 1968 of the existence of "NASD recapture" as soon as the Adviser became aware of a publication by the SEC entitled Release No. 8239 (Jan. 26, 1968), which discussed a proposed SEC rule relating to this practice.[6] Furthermore, the only evidence brought to the Court's attention to show that the Adviser had knowledge of the existence of "NASD recapture" before 1968 was that the Adviser's house counsel had read a 1966 SEC report of 346 pages entitled, "Public Policy Implications of Investment Company Growth," which contained a single sentence relating to what later became known as "NASD recapture." While this evidence could have been the seed to an eventual finding of negligence, it is most unlikely that "gross misconduct" could have been shown.

"A change from independent brokerage to an affiliated broker is not a matter to be lightly undertaken." Moses v. Burgin, supra, 445 F.2d at 374. Indeed, there are many possible hazards[7] that a Fund may encounter if it attempts to switch from an independent to an affiliated broker. For the purposes of this case, it is enough to say that this matter, unlike "NASD recapture," is purely a discretionary decision for the directors.[8]

Nevertheless, discretion can never be exercised well in the dark. There is some evidence that before 1970 (i. e., the date of the filing of the complaint) an unaffiliated director of the Funds was aware of, yet opposed to, broker affiliation. On the other hand, other directors may not have been fully informed. If, in fact, some of the directors were ignorant of this practice before the instigation of this suit in 1970,

the plaintiffs would have had to prove that this was the result of intentional misconduct on the part of the defendants. The Court would characterize the probability of the plaintiffs accomplishing this goal as fair at best.

■ In order to evaluate the reasonableness of the proposed settlement, the Court, in addition to commenting on the legal merits of the plaintiffs' claim, must compare the damages that could have been obtained had the plaintiffs proven their case against both the amount claimed and the value of the settlement. The Court, in Moses, limited recovery on a similar claim relating to "NASD recapture" to the value of " . . . all transactions, making allowances for best execution, and all resulting give-ups that could have been recaptured . . . " Moses v. Burgin, supra, at 385. Without going into the exact numbers involved, the Court notes that any possible recovery would not be large and, in fact, would be miniscule when compared to the possible recovery under Count II of the complaint. It is also small when compared to the value of the settlement. As plaintiff Schlusselberg admits, the possible recovery in this part of the case boils down to nothing more than "a tempest in a teapot." Plaintiff Schlusselberg's Memorandum in Support of Proposed Settlement, p. 27. Furthermore, the fact that the unaffiliated directors would probably have rejected "broker affiliation" would tend to reduce whatever damages that could have been recovered on that part of Count I. Consequently, any possible recovery under Count I would play a small role in determining the reasonableness of the proposed settlement.

---

6. Rule 10b–10, which was never enacted, is laid out in substance in the text of Moses v. Burgin, supra, 445 F.2d at 380.

7. The District Court's opinion in Moses v. Burgin, 316 F.Supp. 31, 42 (D.Mass., 1970), discusses these hazards at length.

8. On May 28, 1971, the unaffiliated directors of all the Funds rejected "broker affiliation" by means of formal resolution. Thus, it is

probable that had they been confronted with the same decision during the time period in question, they would likewise have voted against it. Nevertheless, this probability is not relevant to the question of whether the unaffiliated directors were ignorant of "broker affiliation" before 1970. It would nonetheless have some bearing on the question of damages flowing from any misconduct.

*Count II*

In Count II the plaintiffs allege that the price of shares paid by subsidiaries of State Mutual to the selling shareholders of the Adviser were grossly in excess of the net book value of those shares at the time of the sale. The differential between the sale price and net book value is alleged to be an unlawful premium paid to the selling shareholders for their recommendation to the Funds to renew their advisory contracts with the Adviser as newly acquired by State Mutual. The claim, based primarily upon the case of Rosenfeld v. Black, 445 F.2d 1337 (2nd Cir., 1971), cert. dismissed under Rule 60, 409 U.S. 802, 93 S.Ct. 24, 34 L.Ed.2d 62 (1972), states in essence that the selling shareholders sold their fiduciary office for personal gain.

In 1969, there were doubts whether the Adviser, a successful investment management company, could continue to grow as it had in the past. This was due to a number of factors. First, to remain competitive in the industry, greater capital support was needed to expand the services it offered to the Funds it managed. Second, Mr. Orr, the president, majority stockholder, and founder of the company was 70 years of age at that time. There was great concern among the unaffiliated directors of the Funds as to the continuity and future of the Adviser and its personnel should Mr. Orr die. It must be remembered that the investment management business is highly dependent upon its "human assets." Thus, the officers of the Adviser became interested in the possible sale of the company to another who would provide the needed capital, yet continue the staff and present mode of operations intact.

Mr. Orr was contacted by State Mutual, a large insurance company based in Worcester, Massachusetts, with diversified investment interests. State Mutual had long sought a competent investment adviser. After a series of meetings between officers of the Adviser and State Mutual, a letter of intention was signed on May 1, 1969 which formed the basis of the final sale agreement dated July 18, 1969. The final selling price, which was arrived at through some bargaining, was $29,999,536. This figure was derived by placing a value of $155.68 on the 192,700 shares [9] outstanding of the Adviser owned by the selling shareholders. The book value of these shares at the end of 1968 was slightly more than $6.00 per share. It is the difference between the $30 million selling price and the value of the shares at book value (i. e., the net assets) that is claimed to be the premium paid to the selling shareholders, all of whom are or were employed by the company, for the sale of their fiduciary offices.

The history of the negotiations leading to the sale agreement does not seem to support a finding of misconduct by the Adviser. Mr. Fedeli, an officer of State Mutual, had analyzed the Adviser and had estimated its value to State Mutual to be between $25–30 million dollars. Given the selling shareholder's asking price of $35,000,000, the $30,000,000 sale price does not seem to be out of line. Furthermore, although the parties were cognizant that the sale of the adviser would automatically terminate the existing advisory agreement with the Funds,[10] no mention was made of their renewal during the crucial negotiations leading to the sale. Indeed, Mr. Fedeli has testified that he assumed that the agreements would be renewed after the sale, given the Adviser's long record of success in managing the Funds. While the evidence is not clear, it seems probable that the section in the final contract making the sale conditional upon the renewal of the advisory contracts with the Funds was an after-

9. It was agreed that only 160,537 shares would be sold immediately to State Mutual but that the remaining shares could be bought by State Mutual in the future at the original price per share.

10. See § 15(a)(4) and (b)(2) of the Act, 15 U.S.C. § 80a–15(a)(4) and (b)(2).

thought of the attorneys responsible for drawing up the final agreement.

The unaffiliated directors were at all times informed of the existence of these negotiations. Upon the tentative agreement by the parties as to the essential terms of the sale, the unaffiliated directors of the Funds were fully informed of the details and ramifications pertaining thereto. Soon thereafter, the directors unanimously approved proxy material sent to the Funds' shareholders relating to, among other things, the sale being conditioned upon shareholder approval of the existing advisory contracts. Such approval was procured by a large majority.

■ Section 15(a)(4) of the Act is, in this Court's opinion, the sole embodiment of Congressional regulatory desire with respect to the assignment[11] of advisory contracts. It states two simple relevant propositions and implies no others. First, it is unlawful for a person to serve as an investment adviser to a fund if the relevant advisory contract fails to provide for the contract's automatic termination upon the assignment of the contract. Second, the terminated contract can only be renewed upon the approval of a majority of the outstanding voting securities of the fund. 15 U.S.C. § 80a–15(a)(4). The section makes no reference to any prohibition as to the selling price of an investment management company. As the Ninth Circuit stated in SEC v. Insurance Securities, Inc., 254 F.2d 642, 649 (9th Cir., 1958), cert. den. 358 U.S. 823, 79 S.Ct. 38, 3 L.Ed.2d 64 (1958):

> ". . . the sanction runs against any assignment, whatever the price paid and received therefor. An assignment at net asset value is just as fruitless under this section as one for a substantial price in excess of such value. In either case, the contract is automatically terminated. In no respect is the amount paid or received

for stock control made a factor to be considered."

■ The evil that Congress sought to eradicate in its regulatory scheme was the assignment of advisory contracts without the informed consent of the shareholders of the funds involved. It appears that an informed approval was given by the shareholders in this case. Accordingly, there is little likelihood that the actions complained of in this case would violate prohibitions of § 15 of the Act.

Nevertheless, the thrust of the plaintiffs' claim is not based upon violations of the Act itself. It is predicated on the common law theory "that a . . . person standing in a fiduciary relationship with another, may not sell or transfer such office for personal gain." Rosenfeld v. Black, *supra*, 445 F.2d at 1342, *citing* SEC v. Investment Securities, *supra*, 254 F.2d at 650. In rejecting the contention that the terms of the Act are the exclusive protection to mutual funds when the control of the management company has changed, the Court in *Rosenfeld* held that the Act ". . . did not withdraw safeguards equity had previously provided but impliedly incorporated them." *Id.* 445 F. 2d at 1345. The application of this "implied theory of incorporation" to the facts of this case would have the Adviser and its selling shareholders liable for any profit above net asset value realized upon the transfer of control of the Adviser to State Mutual.

The problem with the plaintiffs' "implied incorporation" theory is twofold. First, there is no indication in the legislative history of the amendments to the Act that Congress meant to incorporate common law principles into Section 15. The Court will not delineate the reasons underlying the above statement. Instead, it chooses to refer to the well reasoned opinion of Judge Bauer in Kuk-

---

11. Sections 2(a)(4) and (9) of the Act, 15 U.S.C. § 80a–2(a)(4) and (9), include a transfer of more than 25% of the voting securities of a company to be an "assignment." Thus the transaction herein falls within the terms of the definition.

man v. Baum, 346 F.Supp. 55, 61–65 (N.D.Ill., 1972).

 Second, language in the *Moses* case strongly indicates that this Circuit would not concur with the holding in *Rosenfeld*. Chief Judge Aldrich, albeit speaking in a factually distinguishable context, referred to the common law rules prohibiting fiduciaries from indulging in self dealing as follows:

> "We do not denigrate these principles, though we need hold relevant only their expression through the federally imposed standard under section 36, which may vary from the state common law." Moses v. Burgin, *supra,* 445 F.2d at 376.

Thus it is highly unlikely that this Circuit would apply common law prophylactic rules to the facts in this case. On the contrary, it would probably resort to Section 36 of the Act to ascertain whether a fiduciary obligation exists between a fund and its investment adviser when the advisory company is sold. That section states:

> " . . . the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser." 15 U.S.C. § 80a–35(b).

It can readily be seen that no fiduciary obligation with respect to a sale or change of control of an advisory company is contemplated by this or any other section of the Act.

> "Unlike an ordinary trust . . . [an investment adviser's] . . . normal activities are frequently touched with self-interest . . . " Moses v. Burgin, *supra,* at 376. This is precisely why Congress enacted the Investment Company Act of 1940. Congress has given a long look at the practices of this industry, yet has failed to either curb the realization of profits upon the sale of the advisory company itself or to establish a fiduciary obligation with respect to such sale.

The Court tends to agree with Congress' judgment. Unlike the fiduciary obligations set out in Section 36 where the advisory company is acting directly for the benefit of the Funds, the sale or change of control of the advisory company itself involves transactions wholly apart from the Funds. The price received by the selling shareholders does not come from the treasury of the Funds. Nor can the price be considered an asset of the Funds. *See* SEC v. Insurance Securities, Inc., *supra,* 254 F.2d at 651.

The Court realizes that laissez-faire economics is a notion long since discarded in this age of regulation. Yet if Congress has seen fit not to prohibit the selling shareholders of an investment advisory company from realizing the benefit of years of toil in building up their business into an entity of substantial worth, the courts should also refrain from doing so. *Accord,* Krieger v. Anderson, 40 Del.Ch. 363, 182 A.2d 907, 910 (Del., 1962); Kukman v. Baum, *supra,* 346 F.Supp. at 65.

Despite the real doubts the Court has as to the continuing validity of the holding in *Rosenfeld,* that decision stands today as the law in the Second Circuit. The rationale of that decision conflicts directly with the reasoning of cases decided in other Circuits. *See:* SEC v. Insurance Securities, *supra;* Equity Fund Inc. v. VWR Corp., CCH Federal Securities Law Reporter ¶ 93,698 (W.D.Wash., Oct. 11, 1972); Kukman v. Baum, *supra.* Furthermore, a *Rosenfeld* claim has never been decided by either this Circuit or the United States Supreme Court. These conflicts and ambiguities must be given some weight in determining whether the settlement is reasonable. "As such, it would appear that the *Rosenfeld* claim is the strongest of all those asserted by the plaintiffs." Marcus v. Putnam, *supra,* 60 F.R.D. at 445. Therefore, for the remainder of this opinion it will be assumed that the

*Rosenfeld* claim has validity both in law and in fact.

■ The Court will not try to calculate with mathematical certainty the value of a recovery under the *Rosenfeld* claim. All of the methods suggested to calculate the "premium" paid to the selling shareholders for their recommendation to the Funds to renew their advisory contracts with the Adviser are highly subjective and imprecise. Suffice it to say that the $24,500,000 figure[12] claimed by the plaintiffs is unrealistic in light of several factors[13] which would tend to reduce it substantially.

■ Although it appears that the likelihood of success on either count would not be great, the uncertainties surrounding the *Rosenfeld* holding must be given some consideration. None of the parties could have predicted with certainty how this Court or the Court of Appeals would have decided such a claim. Despite the fact that this Court with hindsight believes those uncertainties to be slight, it is not especially surprised that the defendants, when confronted with a multi-million dollar claim, chose to settle for the compromise figure of $2.7 million dollars. Another consideration, not yet mentioned, is the enormous expense that further discovery and prolonged trial would have entailed. This is a consideration that should never be taken lightly.

■ The underlying purpose of requiring judicial approval of settlements of shareholder derivative actions is to protect the shareholders and the investment companies from unjust or collusive settlements. Fielding v. Allen, 99 F.Supp. 137 (S.D.N.Y., 1951). The Court does not find the settlement either unjust or collusively impinged. Instead, it finds it fair, just, reasonable and in the best interests of both the shareholders and the investment company involved. Accordingly, the proposed stipulation of settlement is approved.

12.

| | |
|---|---|
| Selling Price 192,700 (shares) × $155.68 (price per share) | $29,999,536 |
| Book Value at 12/31/68 | 828,803 |
| Difference | $29,170,733 |
| Percentage of Advisor's Income attributable to the Funds | 84% |
| PROFIT | $24,503,000 |

13. These factors include a reduction:
(1) for the percentage of total income derived from sources other than the Funds. White v. Auerbach, CCH Federal Securities Law Reporter 92,824, 92,829 (S.D.N.Y., Sept. 1972). Marcus v. Putnam, *supra*, 60 F.R.D. at 446. Note—there is a large discrepancy between the 16% figure used by the plaintiffs and the 50% figure supplied by the defendants. The reduction spoken of here refers only to that portion, if any, of the percentage of total income derived from non-Funds sources greater than 16%.
(2) the portion of the selling price relating to the subsidiary-Distributor which acted as principal underwriter to the Funds and does not come within the purview of the common law prophylactic rule stated in *Rosenfeld*. *See* Newman v. Stein, 464 F.2d 689 (2nd Cir., 1972); Marcus v. Putnam, *supra*, 60 F.R.D. at 446.
(3) the value of the Adviser as a "going concern" or its ability to function successfully in the future. *See* Newman v. Stein, *supra*, 464 F.2d at 697–698. This figure necessarily includes the value of the expertise of the management team built up over many years ("human assets"). White v. Auerbach, *supra*, at 92,830.