UNITED STATES TRUST COMPANY OF NEW YORK, as Successor Indenture Trustee, Appellant-Respondent, v FIRST NATIONAL CITY BANK, Respondent-Appellant.

First Department, May 17, 1977

*Dugald Campbell Brown* of counsel (*James C. Sargent*,

*William M. Kahn, James H. Bell* and *Hollace T. Cohen* with him on the brief; *Whitman & Ransom,* attorneys), for appellant-respondent.

*Robert S. Blanc, III,* of counsel *(George J. Wade* and *Gary C. Lyons* with him on the brief; *Shearman & Sterling,* attorneys), for respondent-appellant.

SILVERMAN, J. These are cross appeals from an order of the Special Term of the Supreme Court granting the motion of defendant to dismiss certain causes of action in the complaint on the ground that they failed to state a cause of action; denying the motion as to other causes of action; and denying plaintiff's motion for partial summary judgment on the ground that there is no defense to its causes of action.

The case arises out of the collapse of Equity Funding Corporation of America ("Equity Funding") reputedly one of the largest and most notorious of modern corporate financial frauds. Although the order appealed from was entered October 23, 1975, the parties did not bring this appeal on for argument for a year and one half, but in the interim the plan of reorganization of Equity Funding was apparently approved by the United States District Court for the Central District of California. The record on this appeal of course does not tell us whether the plan of reorganization has any bearing on the dispute involved in this appeal and the rights of the parties with respect thereto.

Plaintiff, United States Trust Company of New York, is the successor indenture trustee under an indenture dated as of December 1, 1971 between Equity Funding and defendant, First National City Bank, trustee, pursuant to which $38,500,-000 of 5½% convertible subordinated debentures due 1991 were issued and are outstanding. Defendant, First National City Bank, was the original trustee under said indenture. It gave notice of its resignation as trustee on April 5, 1973, the date Equity Funding filed a petition for reorganization under chapter 10 of the Bankruptcy Act (US Code, tit 11, ch 10).

In essence the complaint charges that while defendant was trustee, it favored its own interest as an individual creditor of Equity Funding over the interest of the debenture holders whose indenture trustee the defendant was, and that the defendant is therefore liable for an accounting and for related relief, etc..

## A. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

We may dispose first of the denial of plaintiff's motion for summary judgment. The debentures are by their terms subordinate in right of payment to "all Superior Indebtedness," Section 1301 of the indenture and the definition of Superior Indebtedness in the indenture may well include the claims of defendant as an individual creditor. The issues of the meaning and effect of this subordination agreement and the possible bearing of the plan or reorganization approved by the United States District Court thereon have not been explored either at Special Term or in this court. Indeed, the record would seem to be insufficient at this point for a determination of those issues. Accordingly, plaintiff's motion for summary judgment was properly denied.

## B. DEFENDANT'S MOTIONS

### THE REVOLVING CREDIT AGREEMENT

The first nine causes of action in the complaint relate to property and moneys received by defendant as an individual creditor under a "Revolving Credit Agreement." The Revolving Credit Agreement dated as of June 29, 1972, was entered into by the defendant as agent for itself and three other banks. Under the Revolving Credit Agreement these four banks agreed to make loans to Equity Funding up to a maximum of $75,000,000. Defendant's share of the total lending commitment was about 47%. The Revolving Credit Agreement contained a provision whereby Equity Funding was required to pay a commitment fee of ½% per annum on unused portions of the loan commitment. To the extent that the loan was availed of, Equity Funding was to pay interest at a fluctuating rate equal to or greater than the base rate (also apparently sometimes referred to as the prime rate). Equity Funding had the right to prepay and reborrow. Repayment was required to be made in quarterly installments between September 30, 1976 and June 30, 1980, with provisions under which the lenders could require earlier payments in certain contingencies. The advances under the Revolving Credit Agreement were evidenced by a "grid note," a promissory note on which notations of advances and repayments would be made. On June 29, 1972 the banks advanced $41,000,000 to Equity Funding under the Revolving Credit Agreement. Additional advances of $5,000,000 each were made on or about

October 10, 1972 and February 20, 1973, making total advances under the Revolving Credit Agreement of $51,000,000.

SECTION 613 OF THE INDENTURE'S SHARING PROVISION;<br>DEFINITION OF SECURITY

Six of the first nine causes of action (the first, third, fifth, seventh, eighth, and ninth) rest largely on subdivision (a) of section 613 of the indenture, a provision required by section 311 of the Trust Indenture Act of 1939 (US Code, tit 15, § 77kkk). In essence, the provision requires that the trustee hold in a special account for the benefit of the trustee individually and of the holders of the debentures any amounts or property received by the trustee in reduction of amounts owed or as security for the trustee's individual creditor claim after four months prior to a default under the Indenture.

Subdivision (b) of section 613 of the indenture, also required by the Trust Indenture Act, provides, however, that:

"(b) There shall be excluded from the operation of Subsection (a) of this Section a creditor relationship arising from

"(1) The ownership or acquisition of securities issued under any indenture, or any security or securities having a maturity of one year or more at the time of acquisition by the Trustee".

It is the contention of the defendant that the revolving credit agreement and the grid note constitute a "security or securities" with the requisite maturity; and that, therefore, any payments received with respect to the revolving credit agreement and the grid note were not subject to the sharing provisions of subdivision (a) of section 613 of the indenture. Special Term agreed with defendant and therefore dismissed the causes of action resting on subdivision (a) of section 613.

The indenture and the Trust Indenture Act referred the definition of the term "security" back to the definition in section 2 of the Securities Act of 1933 (US Code, tit 15, § 77b [Trust Indenture Act, § 303; US Code, tit 15, § 77ccc, subd (1)]). The Securities Act of 1933 provides in relevant part:

"When used in this subchapter, unless the context otherwise requires—

"(1) the term 'security' means any note * * * evidence of indebtedness * * * or, in general, any interest or instrument commonly known as a 'security' ".

The Federal courts have frequently had to consider "the vexing question how far instruments bearing the form of

promissory notes are securities within the anti-fraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934." *(Exchange Nat. Bank of Chicago v Touche Ross & Co.,* 544 F2d 1126, 1127.) They have arrived at results with different rationales. The state of these authorities is summarized by Judge FRIENDLY in the *Exchange Nat. Bank* case *(supra).* In that case, Judge FRIENDLY further said (p 1133): "As will be seen, courts have shrunk from a literal reading that would extend the reach of the statutes beyond what could reasonably be thought to have been intended in these two great pieces of legislation and would produce a seemingly irrational difference in the scope of their anti-fraud provisions." The Federal courts have paid great attention to the introductory phrase "unless the context otherwise requires" in the effort to give an appropriate and just meaning to the definition of "security" in particular cases.

The context with which we are concerned is the Trust Indenture Act and particularly its provision with respect to "preferential collection of claims against obligor," (§ 311; US Code, tit 15, § 77kkk).

The Federal cases cited to us arose primarily out of the antifraud provisions of the Securities Act. No case has been cited to us involving the definition of "security" as used in the Trust Indenture Act.

These acts are remedial statutes and they should of course be given a reading consistent with their remedial purpose.

To include a particular instrument within the definition of "security" under the antifraud provisions of the Securities Act brings the transaction within the protection of that act. To include a particular instrument as a "security" within the meaning of section 311 of the Trust Indenture Act (and the corresponding § 613, subd [b] of the trust indenture) would exclude the transaction from the protection of that act.

The introductory section of the Trust Indenture Act on "necessity for regulation" (§ 302; US Code, tit 15, § 77bbb) declared that

"[T]he national public interest and the interest of investors in notes, bonds, debentures, evidences of indebtedness, and certificates of interest or participation therein, which are offered to the public, are adversely affected— * * *

"(3) when the trustee * * * has any relationship to or connection with the obligor * * * or holds, beneficially or

otherwise, any interest in the obligor * * * which relationship, connection, or interest involves a material conflict with the interests of such investors". And the act further provided that: "[I]t is hereby declared to be the policy of this subchapter, in accordance with which policy all the provisions of this subchapter shall be interpreted, to meet the problems and eliminate the practices, enumerated in this section, connected with such public offerings."

We must determine the application of the statute and of subdivision (b) of section 613 of the indenture in the light of this Congressionally mandated canon of interpretation.

So interpreted, we do not think that the revolving credit agreement and the grid note issued thereunder constitute "securities," with respect to which payments are exempt from the provisions of section 311 of the Trust Indenture Act (US Code, tit 15, § 77kkk), or the corresponding subdivision (a) of section 613 of the indenture. As is apparent from the heading of section 311, that section is aimed at "preferential collection of claims" against the obligor. The word "preferential" here of course is used in obvious analogy to the provisions of the Bankruptcy Act with respect to "preferences" made within four months prior to bankruptcy. The section is intended to protect the debenture holders against conflicts of interest arising out of the debenture trustee's "relationship to or connection with the obligor," in particular its relationship as a creditor of the obligor. In that context, we think that the exclusion of "securities" held by the indenture trustee from the sharing requirements of section 311 was primarily intended to cover the case where the indenture trustee holds some securities out of a large public issue and where the indenture trustee's securities are treated the same as the vast majority of securities held by others and there is little or no opportunity or incentive for the indenture trustee to favor its individual interests over those of the debenture holders. Here the revolving credit agreement and the grid note represent a debt owed to four banks; and the indenture trustee, the defendant in this case, was the managing agent of those four banks in connection with that loan. The loan was individually negotiated between defendant and Equity Funding; arrangements could be and were individually made for the protection of the defendant when insolvency was imminent (see, e.g., the Northern Life Insurance stock transaction referred to below).

Thus, the relationship seems to be one where there is at

least a substantial opportunity for the indenture trustee to favor its individual interest over those of the debenture holders, and thus the protections and restrictions of the act should be applicable.

Of somewhat less importance perhaps is the fact that the revolving credit agreement was in some sense a provision for interim financing in that Equity Funding was required to prepay the debt to the extent of net cash proceeds received by Equity Funding from the sale or issuance of any note, debenture, or other evidence of indebtedness, with certain exceptions, or from the sale or other disposition not in the ordinary course of business, of assets of Equity Funding (revolving credit agreement, § 2.05). Nor do we think that for our purposes the revolving credit agreement and the grid note should be deemed a "security" because the $41,000,000 advance under the revolving credit agreement was used almost entirely for the purpose of acquiring a large investment, to wit, the stock of Northern Life Insurance Company.

Accordingly, we hold that the revolving credit agreement, the grid note, and the indebtedness evidence thereby were not "securities" within the meaning of subdivision (b) of section 613 of the indenture and the corresponding subdivision (b) of section 311 of the Trust Indenture Act, and that the Special Term was in error in dismissing the causes of action based on subdivision (a) of section 613 of the Trust Indenture on the ground that they were "securities."

We consider now whether there are other grounds for dismissing the causes of action.

### THE FIRST CAUSE OF ACTION—THE NORTHERN LIFE INSURANCE COMPANY STOCK PLEDGE

The stock of Northern Life Insurance Company acquired by Equity Funding basically with the money borrowed under the revolving credit agreement was pledged as collateral to secure the loans made pursuant to the revolving credit agreement. The complaint does not attack the original pledge. However, on or about March 22, 1973, at the request of one of Equity Funding's officers, defendant released to Equity Funding the certificate representing this stock and received in exchange a certificate representing only 20% of the outstanding stock of Northern Life Insurance Company. On March 27, 1973, trad-

ing of Equity Funding was suspended by the New York Stock Exchange. Two days later, the Equity Funding officer admitted to defendant's responsible officers that employees of Equity Funding had engaged in fraudulent activities; the defendant then requested that the original certificate for 100% of the stock of Northern be returned to it. Equity Funding's officer arranged for the original certificate, which had been forwarded to Northern for cancellation, to be returned, and defendant received it on April 2, 1973. (Defendant also received a new certificate for 100% of the Northern stock issued in the name of a nominee of defendant. The two certificates, each for 100% of the stock of Northern, of course only represent the same 100% interest, and we need not concern ourselves with the fact that there were two certificates.)

In its first cause of action, plaintiff alleges that this redelivery of stock constituted property received by defendant trustee, as security for the defendant trustee's individual creditor claim, within four months prior to a default under the indenture, and thus subject to subdivision (a) of section 613 of the indenture. Defendant contends that its delivery of the Northern stock to Equity Funding was induced by fraudulent representations and that the redelivery was a rescission based on fraud and a mere restoration of the *status quo,* so that as against persons in the position of debenture holders or their successor trustee, it is as if defendant had never delivered the stock certificate to Equity Funding. However, defendant does not specify what the fraudulent representations were. And, in any event, defendant has not made a motion for summary judgment. (Cf. *Rovello v Orofino Realty Co.,* 40 NY2d 633.) At least on its face, the first cause of action is not insufficient and the motion to dismiss it should have been denied.

THIRD CAUSE OF ACTION—INTEREST PAYMENTS OF MARCH 31, 1973 UNDER THE REVOLVING CREDIT AGREEMENT

On March 31, 1973, defendant received a regular quarterly interest payment due on the grid note issued under the revolving credit agreement. This transaction is attacked in the third cause of action as a payment under subdivision (a) of section 613 of the indenture. On the present state of the record, defendant's motion to dismiss this cause of action for failure to state a cause of action should have been denied.

### FIFTH CAUSE OF ACTION—THE SET-OFF

On April 3, 1973, Equity Funding had on deposit in general deposit accounts with defendant and with the three other participating banks under the revolving credit agreement, sums totaling approximately $7,950,000, of which $802,467 was on deposit with defendant. The four banks exercised claimed rights of setoff against the balances to reduce the amount owed under the revolving credit agreement and the grid note, and defendant's share of that indebtedness was thus reduced by a ratable share of the amounts set off. The fifth cause of action contends that this setoff came within the sharing provisions of section 613 (a) of the indenture.

However, subdivision (a) of section 613, in accordance with the statute, excepts from its sharing provisions "any such reduction resulting * * * from the exercise of any right of set-off which the Trustee could have exercised if a petition in bankruptcy had been filed by or against the Company upon the date of such default". Plaintiff contends that under the Bankruptcy Act a setoff could not have been exercised if, within four months prior to bankruptcy, the creditor had received a voidable preference. (Bankruptcy Act, § 57 subd [g]; § 68, subd [b]; US Code, tit 11, § 93, subd [g]; § 108, subd [b].) It is the contention of plaintiff that the re-receipt of the Northern Life Insurance stock constituted such a preference and that, therefore, the exception with respect to the right of setoff is inapplicable. While this contention is not spelled out in the complaint, neither is there anything in the complaint which refutes it. It will obviously require further exploration of the circumstances of the redelivery of the Northern Life insurance stock to determine the question of voidable preference. And, accordingly, the motion to dismiss the fifth cause of action for failure to state a cause of action should not have been granted.

### SECOND, FOURTH, SIXTH, SEVENTH, EIGHTH, AND NINTH CAUSES OF ACTION—BREACH OF COMMON-LAW FIDUCIARY DUTIES

The transactions attacked in the first, third, and fifth causes of action under section 613 (a) of the indenture are also attacked in the second, fourth, and sixth causes of action, respectively, as a breach of the defendant trustee's fiduciary

duty, at a time when defendant knew Equity Funding was in danger of insolvency.

In the seventh, eighth, and ninth causes of action, plaintiff attacks the failure of defendant to declare a default and accelerate the maturity of the debentures until May 1, 1973, which was more than four months after the collection of collateral interest under the revolving credit agreement on December 31, 1972, thus taking those payments out of the reach of subdivision (a) of section 613 of the indenture. The complaint alleges that the filing by Equity Funding of a petition for reorganization on April 5, 1973 was an "Event of Default" under the indenture; that thereupon defendant as trustee could have accelerated the maturity of the debentures; and that the nonpayment of the accelerated principal would have been a default, bringing within the reach of subdivision (a) of section 613 of the indenture all payments made after four months prior thereto. The complaint further alleges that on or about April 3, 1973, defendant delivered to Equity Funding a notice declaring that events of default had occurred under the revolving credit agreement and accelerating the maturity of the indebtedness under the revolving credit agreement; but that although the defendant could have similarly accelerated the maturity of the debentures, it did not do so until May 1, 1973. This failure by defendant is alleged to be a breach of its obligation to use the same degree of care and skill as a prudent man would exercise in the conduct of his own affairs, and willful misconduct or negligence, and a breach of its fiduciary duties to the debenture holders.

Special Term denied the motion to dismiss as to the second, fourth, and sixth causes of action as these did not rest on rights under subdivision (a) of section 613 of the indenture; but granted the motion as to the seventh, eighth, and ninth causes of action because a necessary element of those causes of action was that the revolving credit agreement not be a "security" under subdivision (b) of section 613 of the indenture.

We have already indicated our view that the revolving credit agreement and the grid note did not constitute a "security," and that, therefore, the motion to dismiss should not have been granted on the ground that they were "securities."

Defendant also contends that its duties as trustee were circumscribed by the indenture, that they were purely con-

tractual duties, and that the defendant was not really a trustee within the rules imposing fiduciary liability on trustees.

This precise contention was made and rejected in *Dabney v Chase Nat. Bank* (196 F2d 668). There the court had before it an indenture executed before the Trust Indenture Act and governed by the pre-existing law of New York. The court held in an opinion by Judge LEARNED HAND that notwithstanding very narrow definitions of the trustee's duties in the indenture, the trustee was still liable for breach of its fiduciary obligation of loyalty. In his opinion, Judge HAND said (p 670): "[T]he duty of a trustee, not to profit at the possible expense of his beneficiary, is the most fundamental of the duties which he accepts when he becomes a trustee. It is a part of his obligation to give his beneficiary his undivided loyalty, free from any conflicting personal interest; an obligation that has been nowhere more jealously and rigidly enforced than in New York where these indentures were executed." Speaking of some language in *Hazzard v Chase Nat. Bank* (159 Misc 57, 84, affd 257 App Div 950, affd 282 NY 652), that seemed to suggest that an indenture trustee's rights and duties were defined not by the fiduciary relationship but exclusively by the terms of the agreement, Judge HAND said (p 671): "That language we read only as criticism of practices that had grown up, and not as asserting that the courts of New York had given any countenance to the notion that, so far as a corporation sees fit to assume the duties of an indenture trustee, it can shake off the loyalty demanded of every trustee, corporate or individual. We can find no warrant for so supposing; and, indeed, a trust for the benefit of a numerous and changing body of bondholders appears to us to be preeminently an occasion for a scruple even greater than ordinary; for such beneficiaries often have too small a stake to follow the fate of their investment and protect their rights."

Defendant argues that the Trust Indenture Act has changed this rule, and that by giving its blessing to a corporate trustee also having the status of an individual creditor, the act in essence made the rule of the *Dabney* case inapplicable to indentures governed by the Trust Indenture Act. We do not agree. We do not think that the Trust Indenture Act was intended in any way to take away from debenture holders any protections which they had before the Act.

And we think that the language of both subdivision (b) of

section 323 the Trust Indenture Act (US Code, tit 15, § 77www) and section 510 of the indenture expressly preserve any rights of the debenture holders under the law prior to the enactment of the Trust Indenture Act. Section 323 of the Trust Indenture Act, provides in part: "The rights and remedies provided by this subchapter shall be in addition to any and all other rights and remedies that may exist under the Securities Act of 1933, or the Securities Exchange Act of 1934, or the Public Utility Holding Company Act of 1935, or otherwise at law or in equity". Section 510 of the indenture provides in part: "No right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise."

In our view, the motion to dismiss for failure to state a cause of action was properly denied as to the second, fourth, and sixth causes of action, and erroneously granted as to the seventh, eighth, and ninth causes of action.

### TENTH CAUSE OF ACTION—THE CUSTODIAL COLLATERAL NOTE

In addition to the other transactions to which we have referred, defendant was the holder of a certain "Custodial Collateral Note" dated October 2, 1972 and due June 1, 1973 in the principal amount of $5,000,000. Pursuant to an order of the Reorganization Court dated October 25, 1973, defendant received $1,540,250 as its ratable portion of a payment of $12,500,000 made to custodial collateral noteholders in reduction of principal and interest.

In the tenth cause of action, plaintiff claims that this receipt (being made after a date four months prior to default) is also subject to the sharing provisions of subdivision (a) of section 613 of the indenture. However, subdivision (a) of section 613 of the Indenture (here again tracking section 311 of the Trust Indenture Act) permits the trustee to retain for its own account "distributions made * * * in respect of claims filed against the Company [Equity Funding] * * * in proceedings for reorganization pursuant to the Federal Bankruptcy Act".

In our view, these payments on the custodial collateral note qualify as such distributions.

In its brief, plaintiff also argues that interest payments totaling approximately $156,000 made on January 1, 1973 and April 1, 1973, in respect of interest on the custodial collateral note, are subject to subdivision (a) of section 613 of the indenture. Obviously, such payments were made before the filing of the petition for reorganization. But we find no allegation in the complaint about these payments.

Accordingly, the motion to dismiss the tenth cause of action was properly granted.

The order of the Supreme Court, New York County (FINE, J.), entered October 23, 1975 granting defendant's motion to dismiss certain causes of action, and denying its motion to dismiss other causes of action, and denying plaintiff's motion for summary judgment, should be modified, on the law, so as to deny defendant's motion to dismiss as to all causes of action except the tenth cause of action, and should otherwise be affirmed, without costs.

BIRNS, J. P., CAPOZZOLI and MARKEWICH, JJ., concur.

Order, Supreme Court, New York County, entered on October 23, 1975, unanimously modified, on the law, so as to deny defendant's motion to dismiss as to all causes of action, except the tenth cause of action, and otherwise affirmed, without costs and without disbursements.