FRIENDLY, Circuit Judge:
These appeals arise from the mammoth bankruptcy proceedings of W.T. Grant Co. before Bankruptcy Judge Galgay in the Southern District of New York. Grant initially filed a petition for an arrangement under Chapter XI[1] on October 2, 1975, and was adjudged bankrupt on April 13, 1976. Secured suppliers, holders of senior debentures, bank creditors, general unsecured creditors, and holders of two issues of subordinated debentures filed claims against the bankrupt estate. The present appeals concern the last of a series of compromises and settlements[2] designed to avoid what *602 would necessarily have been extremely protracted litigation with the various claimants. We shall assume familiarity with Judge Galgay’s opinions and will endeavor to state only what is necessary to an understanding of these appeals.

The History of Grant’s Financings

Prior to July, 1973, Grant, which operated a large chain of retail stores, generally satisfied its short-term cash needs by selling commercial paper through a wholly owned subsidiary, W.T. Grant Financial Corporation (Grant Financial); it had relatively small revocable lines of credit at several hundred banks.[3] In the spring of 1973 Grant determined that a portion of the commercial paper outstanding should be converted into long-term debt and approached Morgan Guaranty Trust Co. of New York (Morgan Guaranty) to structure a $100,000,000 five year term loan. On July 5, 1973, Morgan Guaranty arranged such a loan to Grant Financial from eight banks replacing an equivalent amount in their lines of credit to Grant. Among these banks were, in addition to Morgan Guaranty, Chase Manhattan Bank, N.A. (Chase), which was the trustee under an indenture under which $92,507,000 of Grant’s 4[3]/i% unsecured subordinated debentures issued April 15, 1971, were outstanding as of the date of filing under Chapter XI, and First National City Bank, now Citibank, N.A. (Citibank), which was trustee under an indenture under which $834,000 of Grant’s 4% unsecured subordinated debentures issued June 1, 1965, were outstanding as of the date of filing under Chapter XI.
Grant’s financial performance declined during 1973 and in December Moody’s and Standard and Poor’s lowered Grant Financial’s commercial paper ratings from prime 1 to prime 2 and also downgraded Grant’s long-term securities. Grant resorted to borrowing under its lines of credit. On March 5,1974, Moody’s withdrew Grant Financial’s commercial paper rating and further downgraded Grant’s long-term securities. Faced with the need to raise more than $132,000,-000 in order to meet commercial paper maturities in the next week, Grant asked the eight banks to reestablish their lines of credit. They did this in proportion to their prior exposure, with the result that their loans and advances to Grant Financial shortly reached $415,000,000. Even this borrowing was not enough; in August, 1974, Morgan Guaranty, Chase and Citibank each advanced an additional $5,000,000 to Grant (Secured Demand Loans) secured by an assignment of certain accounts receivable. Later in August, 1974, Grant Financial, Grant as guarantor, and eleven bank lenders entered into an Interim Loan and Guaranty Agreement wherein Grant Financial became indebted to the eleven banks in the aggregate amount of $44,000,000 by assuming Grant’s obligation to repay the $15,-000,000 of Secured Demand Loans just described and incurring New Loans of $29,-000,000, all such loans being guaranteed by Grant and secured under an Interim Security Agreement dated as of August 21, 1974, by accounts receivable arising out of the sale of goods at designated stores. This brought the total short-term and long-term loans from Grant’s 12 major bank lenders to approximately $517,000,000.
The Interim Loan and Guaranty Agreement was shortly succeeded by a Loan and Guaranty Agreement dated as of September 16, 1974, which became effective October 8, 1974, less than a year before Grant filed under Chapter XI. The parties were Grant Financial, Grant as guarantor, and 143 banks. The maturity of all outstanding short-term unsecured loans and the $44,-000,000 of secured loans under the Interim *603 Agreement was extended through June 2, 1975, and the banks agreed to increase their loans to $600,000,000. The obligations of Grant Financial were to be guaranteed by Grant. An Initial Security agreement dated September 16, 1974, secured the $600,-000,000 total of outstanding short-term loans and future commitments under the Loan and Guaranty Agreement and the $100,000,000 long-term notes issued under the Term Loan Agreement of July, 1973.[4] On the date when the Loan and Guaranty Agreement became effective, the banks advanced an additional $66,587,500, thereby reaching the $600,000,000 in loans due June 2, 1975, contemplated by the agreement, plus the $100,000,000 represented by the July, 1973, Term Loan Agreement. As of April 1, 1975, Grant, Grant Financial and Morgan Guaranty entered into a Loan Extension Agreement actually executed June 2, 1975, within four months of the filing of Grant’s Chapter XI petition. This provided for paying off a debt of $56,931,665.59 to 116 banks whose individual loans to Grant ranged from $50,000 to $5,000,000 and the extension to March 31,1976, of outstanding short-term loans in the principal amount of $540,916,978 made by the other banks.
Somewhat earlier Grant had been obliged, in order to induce its largest vendors and suppliers to continue providing it with credit, to enter into an Inventory Security Agreement dated as of May 15,1975, wherein Grant gave a lien on designated store inventories to specified vendors and suppliers. Under the Loan and Guaranty Agreement, the bank claimants were to receive a lien on inventory junior to that of the suppliers and the senior debenture-holders.
The final transaction was an Amended Loan Extension Agreement entered into as of August 6, 1975, which became effective on September 15, 1975. This further extended the maturity of the $540,916,978 of short-term bank loans to July 30,1976; subordinated $300,000,000 of that debt to certain trade obligations (the “Trade Subordination Agreement”); and subordinated Grant Financial’s loans of $819,887,663 to the banks’ total claim of $640,916,978 (the “Intercorporate Subordination Agreement”).

The Proceedings in the Bankruptcy Court and the District Court

After Grant had been ordered into liquidation, the banks and Charles G. Rodman, as Trustee, asserted a multitude of claims against each other in an adversary proceeding, the details of which are described in Judge Galgay’s opinion, 4 Bankr.Ct. Dec. at 601-02. The Trustee conducted an elaborate investigation into the affairs of Grant under Bankruptcy Rule 205(a). This encompassed production of the books, records and other documents of Grant, and examination of its remaining and former officers, directors and employees. Before any extensive discovery by the banks, settlement negotiations were instituted. These resulted in an agreement which, in addition to settling the claims of the banks, encompassed what Judge Galgay termed a “global settlement”, i.e., a “framework for the further administration of the bankrupt estate and the satisfaction of claims filed against such estate.” 4 Bankr.Ct.Dec. at 602. So far as here relevant, the settlement provided that the bank claimants were to receive an initial cash distribution of $165,700,000, or approximately 25% of their allowed claims. More was to be paid when and if funds became available. The Trustee agreed not to sue the 116 banks whose loans of $56,931,665.59 were paid in June, 1975. Finally, the agreement created a fund of $95,378,373, the full amount of the claims of subordinated debentureholders, pending resolution of their dispute with the bank claimants as to whether the subordination clauses of their indentures should be given *604 effect so as to subordinate the debenture-holders’s claims to the bank claims. The Bankruptcy Judge approved the banks’ settlement on July 20,1978, finding that “[t]he Trustee will have achieved a result for the estate which approximates, and may exceed, the results which are likely to be achieved by the continued prosecution of his defenses in the Adversary Proceeding” which the bank claimants had initiated, 4 Bankr.Ct.Dec. at 609. There was no appeal of this “global settlement” to the district court.[5]
Having thus provided the necessary framework, the Trustee, the bank claimants, United States Trust Company (U.S. Trust) as indenture trustee replacing Chase under the Indenture for the 4[8]/4% Subordinated Debentures, and representatives of these debentureholders entered into negotiations for the settlement of the latter’s claims. The rights of the debentureholders depended on the interpretation and application of a clause in their indentures subordinating their claims to “Senior Indebtedness” of Grant. The Indenture under which the 4%% Debentures were issued defined this as stated in the margin;[6] the Indenture securing the small amount of outstanding 4% Debentures was to the same effect. If the bank claims were and remained enforceable as Senior Indebtedness to which the debentureholders were subordinated, the latter would receive nothing. However, U.S. Trust alleged that for a number of reasons the conduct of the banks might require that the contractual subordination provisions be disregarded and even that the subordinated debentureholders be accorded a status prior to that of the banks.[7] These *605 reasons, stated in detail in Judge Galgay’s opinion approving the settlement, 4 B.R. at 60-61, were as follows:
(a) At the time of the Initial Security Agreement of September 16, 1974, the bank claimants knew or had reasonable cause to believe that Grant was insolvent and that the granting of security interests would discourage further extensions of trade credit to Grant and substantially reduce the flow of merchandise into Grant stores, thereby impairing the prospects for a successful reorganization of Grant.
(b) By forcing Grant into the Inventory Security Agreement and Trade Subordination Agreement the bank claimants increased the amount of Senior Indebtedness to which the junior debentureholders were subordinated.
(c) In the summer of 1974, the bank claimants directed Grant not to proceed with a proposed sale of $100,000,000 of customer accounts receivable to Beneficial Finance Corporation and the use of some undetermined portion of the proceeds to purchase 43/4% debentures at 25 cents on the dollar.
(d) The bank claimants used their position of control over Grant’s management to prevent Grant from promptly seeking relief under the Bankruptcy Act, feeding it just enough money to keep its head above water while strengthening their security position, allowing the passage of the four months period for avoiding preferences under § 60a and hoping to allow the passage of the one year provision of § 67d(2) for the avoidance of liens and fraudulent transfers.
The bank claimants made a variety of responses. They denied having had any fiduciary relationship to Grant, asserted that they had made loans in the belief fostered by Grant’s management that Grant remained viable, contended that Grant’s management itself had abandoned the proposed sale of accounts receivable, and denied that they had prevented Grant from seeking rehabilitation under the Bankruptcy Act. They asserted, moreover, that as to many of U.S. Trust’s claims, the remedy, even if the claim were made out, would be invalidation of the banks’ security interests rather than subordination to the debentureholders. U.S. Trust also raised claims of conflict of interest and derelictions of duty against Chase, its predecessor trustee, to which Chase answered.
The settlement originally provided for the payment of 14% of the claims of the accepting subordinated debentureholders. All rights of non-acceptors were preserved, and neither the offer nor the bank settlement agreement was to have any effect in any proceeding brought by them. The indenture trustees, U.S. Trust and Citibank, were, however, to be released from all further obligations to enforce the rights of debentureholders under their respective indentures.
At a hearing before Judge Galgay objections were made by eleven debentureholders, led by Victor Kurtz as chairman of an “Ad Hoc Protective Committee of Holders of 43/4% Debentures”, see note 5, supra, and represented by I. Walton Bader. A group of Institutional Investors also raised objections at the outset but have played no subsequent role in the case. The Kurtz objectors asserted principally that the Trustee had failed to make a presentation of the facts and law adequate to support approval of the settlement, that the bank claims should be equitably subordinated to the debentures because of the control and dominion over Grant allegedly exercised by the banks, and that the Trustee, U.S. Trust and their respective counsel are subject to conflicts of interest which require them to be disqualified. Acknowledging the task imposed by Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968)[8], *606 Judge Galgay, after 27 pages of discussion, 4 B.R. at 57-84, concluded that the original settlement represented a fair compromise, taking into account the strengths and weaknesses of the claims of both sides and the delay and expense incident to litigation,[9] and approved it on February 20,1980.
Timely appeals were taken to the District Court (Conner, J.) by Kurtz and nine other debentureholders represented by Bader and Morton Robson (No. 80 — Civ. 1857), and by debentureholder Levy and three others represented by Bader and Bradley R. Brewer. The latter did not take an appeal on behalf of his present clients, David Cosoff and Helen Finkelstein, who were not named objectants but had asked Mr. Brewer to represent them at the time of the hearings before the Bankruptcy Judge. Before the appeals could be heard, negotiations looking toward an improvement of the offer were begun. Judge Conner stayed consideration of the appeals and allowed negotiations to go forward under the Bankruptcy Judge’s supervision. See In re W.T. Grant Co., 13 B.R. 1001, 1002 (S.D.N.Y.1981). These resulted in an amended offer. The amount payable to the debentureholders was raised from a floor of 14 cents on the dollar to one of 19 cents on the dollar.[10] Interest on the reserve fund calculated from the date of approval by the bankruptcy judge would run for the benefit of the debentureholders. Solicitation of acceptances could start immediately. As soon as the tendering debentureholders were paid, the banks could also draw down the remainder of the $95,378,373 reserve fund set aside under the bank settlement agreement.
A conference on certain details was held in Judge Galgay’s chambers on April 16, 1981. The appearance list shows Robson as appearing for “Kurtz et al.” and Bader for “Bondholders”. There was much discussion of the withdrawal of the appeals from Judge Galgay’s order of February 20, 1980. Robson and Bader agreed that, subject to certain contingencies later worked out, they would withdraw their appeals with prejudice. Bader announced that although he had brought Brewer into the case and Brewer had signed his name on the briefs, Brewer was not the attorney for the Levy appellants, who were Bader’s clients, and had not signed the notice of appeal. Robson’s and Bader’s stipulations withdrawing appeals from the February 20, 1980, order with prejudice and without costs were signed and so ordered.
In the further proceedings before Judge Galgay relating to the new settlement offer, objections had to be submitted in writing by June 12, with a hearing to be held on June 16. Brewer filed no written objections by June 12 because no one had authorized him to do so. A day later appellant Cosoff retained him to oppose the settlement. At the hearing on June 16 Judge Galgay gave him time to argue; Brewer there objected only to an alleged inadequacy of notice and to the provisions concem *607 ing attorneys’ fees. By order dated June 23, 1981, Judge Galgay approved the amended offer, which has now been accepted by some 80% of the debentureholders. On July 1, 1981, Cosoff and Finkelstein, represented by Brewer, and Miller and McGinnis, originally represented by Douglas F. Eaton and now by Stuart E. Jackson, filed notices of appeal, which on this occasion came before District Judge Duffy. The grounds of appeal were largely those that had been argued before Judge Galgay at the hearing on the first settlement offer.[11] On March 15, 1982, Judge Duffy affirmed the order of the bankruptcy court, 20 B.R. 186 (S.D.N.Y.1982), primarily on the ground that the dismissal of the appeals from the order of February 20, 1980, rendered that order res judicata. The instant appeals are from Judge Duffy’s order.[12]

Discussion

Although the trustee in bankruptcy has not raised the point and U.S. Trust Company has done so only feebly, we begin by noting some concern whether appellants have standing to appeal in light of the fact that the settlement leaves them free to pursue their remedies. We see nothing in the argument of their counsel that they are entitled to represent accepting debenture-holders since a rejection of the settlement would necessarily lead to a still further improvement in the offer. There can be no such assurance. Although the banks indeed moved rather quickly from 14 cents to 19 cents, there must be a point at which the banks would prefer to litigate rather than give up more in settlement, and no one knows but the banks and their counsel where that is. Beyond this there is no proof that accepting debentureholders have authorized appellants to appear for them. Appellants’ argument with respect to standing must be rather that in a case of this sort'the right of an individual debenture-holder or even of a considerable group of such holders to assert their claims against the embattled forces of ten of the country’s largest banks, once deprived of the resources afforded in the past by the bankruptcy trustee and the indenture trustee, is more fiction than fact. With claims of 80% of the debentures settled, the threat to the banks by a few holdouts is not substantial. Bringing the bankruptcy trustee, or the indenture trustee, or both, back to the negotiating table or to court is the only realistic recourse to preserve an opportunity for debentureholders who have not yet accepted to achieve more. The situation is comparable to that of court-approved settlements of class actions, in which “even where class members had the right to exclude themselves from the class, they may appeal from an order approving a settlement which they deem unsatisfactory,” 3B Moore, Federal Practice 123.80[5] (2d ed. 1982), lest small claimants “be faced with equally unpalata *608 ble alternatives — accept either nothing at all or a possibly unfair settlement,” Ace Heating & Plumbing Co. v. Crane Co., 453 F.2d 30, 33 (3 Cir.1971).
We have little doubt as to the correctness of Judge Duffy’s observations about res judicata in the usual case or even in most cases of the approval of settlements in bankruptcy. An appeal by one creditor will not save the situation for another if the first withdraws his appeal — if for no other reason than that the time for the other to take an appeal will generally have expired. See 9 Moore, Federal Practice 1204.11[4] (2d ed. 1982). Here the latter obstacle does not exist. The operative order was Judge Galgay’s order of June 23, 1981, approving the revised settlement and the Cosoff-Finkelstein and Miller-McGinnis appeals were timely. By the time the Kurtz and Levy appeals from the February 20, 1980, order were withdrawn the amended offer had been made public and, if the appeals had not been formally withdrawn, Judge Conner would surely have found some way of getting rid of them rather than devote his time to hearing appeals from an order that was about to be superseded. Apparently the reason why withdrawal of the appeals was sought was to permit speedy dissemination of the new offer without having to await the district court’s decision as to the superseded offer, see 20 B.R. at 188; that purpose was accomplished. We see no indication that anyone thought at the time that the withdrawal of the appeals from the February 20, 1980, order with prejudice would deprive objectors to the new offer of a right to appeal on the merits if Judge Galgay were to approve this. Beyond all this, policy considerations weigh against a rigid application of res judicata when such serious attacks have been made upon the bankruptcy trustee and his counsel, the present and former indenture trustees for the 4%% debentures, and the bankruptcy judge. We therefore proceed to Judge Duffy’s alternative ground of decision, on which he did not elaborate, that the appeals are lacking in merit. 20 B.R. at 190. While we could remand the case to him to perform the task of a detailed analysis of the settlement and ordinarily would do so, nearly three years have elapsed since the initial approval of the settlement, and a remand and subsequent appeal would doubtless add nearly another year.
In undertaking an examination of the settlement, we emphasize that this responsibility of the bankruptcy judge, and ours upon review, is not to decide the numerous questions of law and fact raised by appellants but rather to canvass the issues and see whether the settlement “fall[s] below the lowest point in the range of reasonableness”, Newman v. Stein, 464 F.2d 689, 693 (2 Cir.), cert. denied sub nom. Benson v. Newman, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972). We shall not attempt to deal with every argument advanced by appellants but will concentrate on what seem the most nearly persuasive.
We start with appellants’ argument that, quite apart from the banks’ conduct, part or all of the banks’ claims are not “Senior Indebtedness”, see note 6, supra, to which alone the claims of debentureholders are subordinated. We can pass over the frivolous argument that the language does not cover further borrowings, to which Judge Galgay gave the treatment it deserved, 4 B.R. at 70-72. Appellants next argue that until Grant’s guaranty of August 21, 1974, the banks’ claims did not qualify as Senior Indebtedness of Grant since their loans were not to Grant but to Grant Financial. Judge Galgay thought a sufficient answer to be that Grant’s indebtedness to Grant Financial was evidenced at the time of the filing of the Chapter XI petition by an Intercorporate Demand Note in the amount of $819,887,663, more than the amount of the banks’ loans to Grant Financial, and that this would qualify as Senior Indebtedness if the corporate entities are respected; if they are not, as well might be proper, the loans to Grant Financial, all evidenced by notes, would qualify even more directly. Beyond this, the $15,-000,000 Secured Demand Loans of August 1974 were originally made directly to Grant, and the $44,000,000 loaned under the Inter *609 im Loan and Guaranty Agreement of August 21, 1974, was guaranteed by Grant. Finally, under the Loan and Guaranty Agreement all loans by Grant Financial were guaranteed by Grant. While this did not become effective until October 8, 1974, which fell 6 days short of a year of the Chapter XI petition, there is no showing that the trustee could have established lack of fair consideration for the guaranty under § 67(d). The legal standard in a situation such as this, which is governed by § 67(d)(1)(e) of the Bankruptcy Act, is whether “the economic benefit ... that accrued to [the] bankrupt as a result of the third person’s indebtedness” was “ ‘disproportionately small’ when compared to the size of the security that that bankrupt gave and the obligations that it incurred,” Rubin v. Manufacturers Hanover Trust Co., 661 F.2d 979, 993 (2 Cir.1981). See also Klein v. Tabatchnick, 610 F.2d 1043, 1047 (2 Cir. 1979). Through its subsidiary, Grant received the full benefit of the extended maturity of some $490,000,000 in short-term loans and additional loans up to the total amount of $600,000,000 in return for its guaranty and for security interests, see note 4, supra, estimated by the Bankruptcy Judge to amount to $288,000,000, 4 Bankr. Ct.Dec. at 606. We thus conclude that while the subordinated debentureholders have some arguments that the larger part of the bank debt would not qualify as Senior Indebtedness because the loans initially were made to Grant Financial rather than to Grant, these did not have much chance of prevailing.
Appellants contend that, however things might otherwise stand, the banks are estopped from claiming that Grant’s indebtedness to Grant Financial constituted Senior Indebtedness because the prospectus under which the 4%% Debentures were issued showed Senior Indebtedness of only $28,-775,000 whereas Grant then owed Grant Financial $246,420,216. The Bankruptcy Judge accepted the Trustee’s answer that where there is a conflict between a prospectus and the language of an indenture, the latter controls, citing In re Discon Corp., 346 F.Supp. 839, 844 (S.D.Fla.1971). Appellants’ argument, however, is not really one of construction; they say that even if the words are sufficient, Grant, allegedly with the banks’ knowledge, acted in such a way as to make it inequitable for the banks to rely on the words. Yet even if this were upheld — and we find no proof of the banks’ complicity in Grant’s prospectus, the point remains that the prospectus goes on to define Senior Indebtedness as, inter alia, “indebtedness ... for money borrowed from or guaranteed to persons, firms or corporations evidenced by notes or similar obligations” (emphasis supplied). Grant’s fresh guaranty of the indebtedness of Grant Financial to the banks in 1975 would itself therefore qualify as Senior Indebtedness even if some principle of estoppel were to prevent the banks from claiming that the unguaranteed intercorporate loans from Grant Financial would not have done so in 1971.
Once it is concluded that there was a strong probability that all of the bank debt would be deemed Senior Indebtedness and a certainty that some of it would be, appellants’ other claims lose much of their force. It is true, as appellants urge, that the contractual subordination of the debentures to the bank debt would not prevent the bankruptcy court, as a court of equity, from placing the debentures on a plane of equality with or even, although this is harder to envision, see note 7, supra, of superiority to all or part of the Senior Indebtedness if the banks had engaged in inequitable conduct. However, what appellants disregard is that in judging the equity of the banks’ conduct their position as creditors prima facie senior to the debenture-holders must be taken into account. We see no reason to quarrel with the substance of Judge Galgay’s summary of the law of equitable subordination, 4 B.R. at 74-75, although every judge would probably state his own version differently. We entirely agree with his conclusion that “[a] creditor is under no fiduciary obligation to its debtor or to other creditors of the debtor in the collection of its claim”, 4 B.R. at 75, and cases there cited. See Weinberger v. Ken *610 drick, 698 F.2d 61 at 78 (2 Cir.1982). The permissible parameters of a creditor’s efforts to seek collection from a debtor are generally those with respect to voidable preferences and fraudulent conveyances proscribed by the Bankruptcy Act; apart from these there is generally no objection to a creditor’s using his bargaining position, including his ability to refuse to make further loans needed by the debtor, to improve the status of his existing claims.
Returning to the four principal points raised by objectors, see p. 605, supra, we thus think the bankruptcy judge was warranted in giving relatively little weight to those labeled as (a) and (b). The premise of both arguments is that sometime between September of 1974 and May of 1975 the banks knew or had reasonable grounds to believe that Grant was insolvent. Although the Trustee had alleged this in his answer to the banks’ claims, we have been cited to no evidence that would support this. To the contrary there was much testimony that Grant continued showing a substantial net worth and that the banks considered it viable almost to the end.
Taking up next the objection lettered (d), the gravamen of this charge is that Grant management, apparently in the summer of 1974, contemplated taking action to place Grant in a Chapter XI proceeding, which might have enabled Grant to survive as a reduced operation with lower administrative expenses, but that the banks prevented this, making specious explanations but acting in reality to improve their preferred position. For this appellants cited passages from two depositions neither of which supports the contention they advance. In the first of appellants’ references, John P. Schroeder, Morgan Guaranty’s officer in charge of the Grant credit, merely agreed with questions suggesting that in the late summer of 1974 the banks wished “to recoup the most amount of money as possible on the Grant loans”, an understandable and permissible desire, and that for this reason they “did not opt for liquidation at that time”. In the second passage cited, Robert Dannenbaum of the Bank of New York stated that at some unspecified time the banks would have liked an “unofficial reorganization program”, by which he meant not a Chapter XI proceeding but rather nothing more than “general monitoring of the Company’s affairs by the banks”. No suggestion is found in any passage of these witnesses’ testimony reproduced by appellants that Grant itself actively contemplated undergoing voluntary liquidation or reorganization under the Bankruptcy Act in the summer of 1974. We also note that after July, 1974, the banks increased their loans by $44,000,000 in August, 1974, and by another $66,587,500 in October, 1974, and on September 15, 1975, subordinated $300,000,000 of their debt to trade obligations. While a sinister interpretation is possible, this is not demanded; considering that the fresh money provided by the banks after July, 1974, amounted to some $226,000,000 as against $95,378,373 principal amount of the debentures, the banks would have been paying a rather high price to obtain whatever legal advantages the various arrangements of July, 1974, through September, 1975, would yield in the event of Grant’s invoking the Bankruptcy Act.
With respect to objection (d), the Bankruptcy Judge was warranted in attaching little importance to general statements by Grant officials that the banks were “running” Grant. There is no doubt that, at least from March of 1974, the banks kept careful watch on what was going on at Grant; they would have been derelict in their duty to their own creditors and stockholders if they had not. It is not uncommon in such situations for officers whose companies have been brought to the verge of disaster to think that they still have better answers than do the outsiders. In order to establish their claims the appellants must show not simply that the banks proffered advice to Grant that was unpalatable to management, even advice gloved with an implicit threat that, unless it were taken, further loans would not be forthcoming. They must show at least that the banks acted solely for their own benefit, *611 taking into account their reasonable belief that their claims constituted Senior Indebtedness vis-a-vis the debentureholders, and adversely to the interest of others.
The allegation most discussed by appellants is that lettered (c). With respect to this the record, along with materials submitted in support of and in response to the petition for rehearing in Weinberger v. Kendrick, supra, enable us to piece out the story. Harry Pierson, the acting president of Grant and Robert Luckett, the controller, made a report to a meeting of the Grant board of directors in June of 1974 proposing a transaction wherein $100,000,000 of customer accounts receivable would be sold to Beneficial Finance Company (Beneficial) at a discount of up to 27% and some undetermined portion of the proceeds[13] would be used to purchase on the market 4%% subordinated debentures which were then selling at about 25 cents on the dollar. Pierson reported that two of the major banks, Morgan Guaranty and Chase, were opposed to the transaction until some time after the completion of the proposed bank loan commitment, presumably the Loan and Guaranty Agreement executed on October 8, 1974. Their reasons were that proceeds of one of Grant’s most valuable assets would be used to pay junior debt and that trade creditors would be upset. According to Luckett, Pierson had nevertheless determined to sign the contract with Beneficial and apparently persisted in that intention after a meeting at Morgan Guaranty where the banks’ opposition was strongly conveyed. However, when Grant’s attorneys received the documents from Beneficial, they found, as often happens in negotiations of this sort, that the provisions were distinctly more onerous than the Grant officers had supposed. For example, Beneficial reserved the right to cull the accounts tendered, would make no payment until 30 days elapsed, and could put back to Grant any accounts that it found difficult to collect. These and numerous other snags in the draft agreement led Charles A. Doyle, then an attorney in Grant’s Legal Department, to report to Robert Kelly, his superior, that “it would be legally unwise and unsound to execute any of these agreements in their present form.” This view was shared by Kelly, as well as by John Sundman, Grant’s new Financial Vice President and its closest link with the banking community.
It would seem a sufficient answer to the objectors that the Beneficial deal was abandoned for reasons relating to its terms that were entirely independent of the banks’ opposition. Beyond that we think it would have been surprising if the banks had not objected to the portion of the transaction which involved use of proceeds of quick assets to purchase long-term subordinated debt. The banks reasonably thought that their claims were senior to the debentures. True, the purchase of debentures at 25 cents on the dollar would have meant a saving of interest of some 19% on the purchase price. But Grant’s immediate problem was short term; what it needed was to conserve resources and obtain short-term loans in order to stay afloat until the tide turned. Even if we should assume the evidence went so far, we see nothing inequitable in the banks taking the position that if Grant wished use quick assets to redeem subordinated long-term debt, even on an advantageous basis, it could expect no further help from them.
The appellants raise a special point concerning Chase. As previously stated, Chase, one of the three lead banks, had been Indenture Trustee for the 4%% debentureholders until August, 1974, when it resigned and was succeeded by U.S. Trust. A debentureholder accepting the offer of settlement releases his claim against both.[14] Despite the limited duties of a trustee for *612 debentureholders, as distinguished from a trustee holding property as security, it is settled in this circuit that he owes a duty “not to profit at the expense of his beneficiary”, Dabney v. Chase Nat'l Bank, 196 F.2d 668, 670 (2 Cir.1952) (L. Hand, J.), as supplemented, 201 F.2d 635 (2 Cir.), cert. dismissed per stipulation, 346 U.S. 863, 74 S.Ct. 103, 98 L.Ed. 374 (1953). See also United States Trust Co. v. First National City Bank, 57 A.D.2d 285, 296, 394 N.Y.S.2d 653, 660-61 (1st Dep’t 1977), aff’d, 45 N.Y.2d 869, 410 N.Y.S.2d 580, 382 N.E.2d 1355 (1978); Broad v. Rockwell Int’l Corp., 642 F.2d 929, 959-60 (5 Cir.) (en banc) (construing New York law), cert. denied, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981); Morris v. Cantor, 390 F.Supp. 817, 824 (S.D.N.Y.1975). When an indenture trustee assumes the role of a lender, it takes the risk that, in the event of insolvency of the issuer, its acts will be subject to special scrutiny. Here the Bankruptcy Trustee conducted an examination of Chase’s files covering its activities as indenture trustee, and objector Kurtz deposed a Chase vice president concerning its decision to resign as indenture trustee and other matters. Neither the deposition nor any of the exhibits marked thereat were offered in evidence at the hearing on objections. In their briefs in this court objectors rely on Chase’s having played a principal role in the opposition to the sale of accounts receivable to Beneficial Finance Co. and having participated in the negotiation and drafting of the agreements of the summer and fall of 1974.
At first blush the argument that Chase helped to thwart a plan whereby at least some of the debentureholders would have received partial payment might seem to have possible merit. However, it falls on the rock of so much of our previous discussion as shows that Grant would not have consummated the Beneficial deal apart from the banks’ opposition. The second argument falters on the fact that the $44,-000,000 of secured loans covered by the Interim Loan and Guaranty Agreement were new money, $12,480,000 of which was supplied by Chase. Even if the facts showed that Chase participated in negotiation of the October 8,1974, Loan and Guaranty Agreement while still indenture trustee, which is not at all clear, this also involved $66,587,500 of new money, $17,973,-000 of which was supplied by Chase. This is some distance from the acts of “[a] creditor who accepts payment of part of a loan before it is due, from a debtor known to be ‘fighting for its life’, and who insists upon security for the balance [of unsecured debt] when it is due”, of which Judge Hand wrote in Dabney, supra, 196 F.2d at 672. As the Fifth Circuit en banc recently concluded, New York authority runs contrary to the assertion “that an indenture trustee has a duty, fiduciary or otherwise, to seek for the holders of debentures any benefits that are greater than those contractually due them,” Broad v. Rockwell Int’l Corp., supra, 642 F.2d at 959 (emphasis in original). In short, while Chase might have been better advised to resign at an earlier date we see little prospect of a recovery against it as indenture trustee on the facts before us.
The only other contention of appellants we deem worthy of discussion is their position that Weil, Gotshal & Manges (WGM) should have been disqualified as attorneys for the Bankruptcy Trustee. Although their argument is cast in terms of disqualification, what appellants are really saying is that WGM’s allegiance to the banks led the firm to make an inadequate investigation of the claims of preferences, fraudulent conveyances, and so forth, raised in the Trustee’s answer in the adversary proceeding initiated by the banks and, in part because of this lack of investigation, to recommend a settlement too favorable to the banks. The claimed bases for “disqualification” are that:
(1) WGM acted as counsel for the bank claimants for five days after the initiation of the Chapter XI proceeding and before it was retained as co-counsel by a creditors’ committee representing both the bank and other claimants;
*613 (2) WGM was one of two co-counsel representing the creditors committee throughout the Chapter XI proceeding and until its engagement as counsel for the Trustee in liquidation;
(3) From February, 1975, until April, 1977, WGM acted as counsel for Morgan Guaranty in connection with a $9,000,000 claim against Bowmar Instrument Corp. in a Chapter XI proceeding;
(4) Until 1975, WGM was counsel for Shapiro Brothers Factors Corp., a wholly owned subsidiary of Chase, and it now represents Chase Manhattan Mortgage and Realty Trust, a publicly owned real estate investment trust with ties to Chase.
Judge Galgay overruled this claim, 4 B.R. at 82, partly in reliance on § 44c of the Bankruptcy Act, which provides:
An attorney shall not be disqualified to act as attorney for the receiver or trustee merely by reason of his representation of a general creditor.
Appellants answer that their objection goes to WGM’s affiliations not with general creditors but with institutions claiming to be lien creditors.
However, we do not find that any of the relationships charged by appellants were disqualifying. The five days of representation of the bank claimants were de minimis; appellants point to no action taken during that period on WGM’s advice which figured in the later investigation or negotiations.[15] We likewise have been pointed to no disqualifying action taken while WGM was co-counsel for the creditors’ committee in the Chapter XI proceeding. Although appellants allege it was understood that WGM was representing the banks and the co-counsel, Ballon, Stoll & Itzler, were representing other creditors, we have been shown nothing to substantiate this or to show that WGM was advancing the cause of the banks in this case. We see no reason to disagree with Judge Galgay’s reaffirmation, 4 B.R. at 83, of his conclusion in In re REA Holding Corp., 4 Bankr.Ct.Dec. 1249, 1253 (Bankr.S.D.N.Y.1979), vacated and remanded on other grounds, 2 B.R. 733 (S.D. N.Y.1980), that “[t]he role of counsel to an official creditors’ committee is not adverse to or in conflict with the role of counsel to a bankruptcy trustee if liquidation should subsequently ensue.” WGM’s previous representation of one or more of the banks or their subsidiaries in unrelated matters is scarcely a ground for disqualification. There is no contention that WGM regularly served any of the banks in bankruptcy cases, and their having done so in one or more unrelated cases would not prevent a vigorous assertion of the claims of the subordinated debentureholders against the banks. On an issue of this sort particular weight should be given to the conclusion of the Bankruptcy Judge, who had abundant opportunities to observe the activities of WGM over many months and concluded “that the Trustee’s attorneys have served him and the creditors of the bankrupt estate with vigor, objectivity and independence.”
We conclude by reemphasizing that the task of the bankruptcy judge was not to determine whether the settlement was the best that could have been obtained, something that neither he nor we can ever know, but whether it “fall[s] below the lowest point in the range of reasonableness”, Newman v. Stein, supra, 464 F.2d at 693. If we take the Trustee’s estimated realization of $600,000,000, and deduct the estimated $143,000,000 of administration and § 64a priority claims, the $76,000,000 owing to secured suppliers, and the $24,000,000 owing to senior debentureholders, there would be a balance of $357,000,000 available for distribution among $650,000,000 of bank claims, $95,000,000 of Subordinated Debentures and $82,000,000 of general unsecured claims, 4 Bankr.Ct.Dec. at 606. If the *614 banks could sustain their claims of subordination, let alone their claims of lien protection for $288,000,000 of their debt, the subordinated debentureholders would take nothing. Even if the banks’ claims to secured creditor status and subordination of the debentures were rejected but the banks were not subordinated to them, all of which was highly problematical, the debenture-holders would receive only 43 cents on the dollar, after much further expense. After considering the strengths and weaknesses of the claims of the debentureholders a settlement assuring them of 19 cents can hardly be regarded as below the lowest point in the range of reasonableness.
We therefore affirm the judgment of the district court on the merits.

. All references are to the Bankruptcy Act of 1898 and the Rules thereunder.

. The earlier ones were a compromise and settlement with the secured suppliers, approved by the Bankruptcy Court on Feb. 3, 1977, aff'd, Docket No. 78-5010 (2 Cir., April 6, 1978); a *602 compromise and settlement with senior debentureholders approved Jan. 18, 1978; a compromise and settlement with the bank claimants approved July 20, 1978, 4 Bankr.Ct.Dec. 597; a first order approving a compromise and settlement with the junior debentureholders dated Feb. 20, 1980, 4 B.R. 53; and a further order dated June 23, 1981, approving a revised form of this settlement, from which the appeals here at issue were taken.

. For example, as of Jan. 31, 1973, Grant had only $10,000,000 in bank debt, all of it short term, as against $380,033,500 in outstanding commercial paper.

. The security was to consist of all of Grant’s customer accounts receivable and the securities of Zeller’s Ltd., a Canadian subsidiary of Grant. The security was pledged ratably for the benefit of $23,995,000 of Grant’s 4[3]A% senior sinking fund debentures. All financing statements required to perfect security interests under the Initial Security Agreement were timely filed by Morgan Guaranty as agent.

. An “Ad Hoc Protective Committee of 43A% Convertible Subordinated Debentures of W.T. Grant Company”, including Mr. Victor Kurtz and represented by I. Walton Bader, raised objections to the banks’ settlement at the hearing. The failure by Mr. Kurtz’s “Protective Committee” to pursue its objections by appealing from the Bankruptcy Judge’s allowance of the banks’ claims forecloses some of the issues raised in the present appeal. While Judge Gal-gay expressly reserved “the claims of Subordinated Debentureholders purportedly represented by the Ad Hoc Protective Committee” pending subsequent determination of “the validity and enforceability of the subordination provisions contained in the Subordinated Debentures and related Trust Indentures,” 4 Bankr. Ct.Dec. at 608, this reservation of claims against the bankrupt estate and, by extension, against the bank claimants, does not go still further to permit, e.g., re-opening of the question whether the Trustee properly agreed not to question the June, 1975, payments of $56,931,-665.59 to the 116 other bank creditors of Grant.

. The term “Senior Indebtedness” shall mean the principal of and premium, if any, and interest on (a) indebtedness (other than the Debentures and the Convertible Subordinated Debentures due June 1, 1990 of the Company) of the Company for money borrowed from or guaranteed to persons, firms or corporations evidenced by notes or similar obligations, (b) indebtedness of the Company evidenced by notes or debentures (other than the Debentures and the Convertible Subordinated Debentures due June 1, 1990 of the Company) issued under the provisions of an indenture or similar instrument between the Company and a bank or trust company or (c) purchase money indebtedness of the Company, in each case, whether outstanding at the date of execution of this Indenture or thereafter incurred; unless, in each case, by the terms of the instrument by which the Company incurred, assumed or guaranteed such indebtedness, it is expressly provided that such indebtedness is not superior in right of payment to the Debentures. As used in the preceding sentence the term “purchase money indebtedness” shall mean indebtedness evidenced by a note, debenture, bond or other instrument (whether or not secured by any lien or other security interest) issued or assumed as all or a part of the consideration for the acquisition of property, whether by purchase, merger, consolidation, or otherwise; provided, however, that such term shall not include any account payable or any other indebtedness created or assumed by the Company in the ordinary course of business in connection with the obtaining of materials or services.

. We reject the objectants’ assumption that the doctrine of equitable subordination must invariably work to reverse the positions of senior and junior creditors. The equitable powers of the bankruptcy court are broad, Pepper v. Litton, 308 U.S. 295, 304-05, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939), and it may “adjust ... equities among the creditors” in a flexible manner, Herzog & Zweibel, The Equitable Subordination of Claims in Bankruptcy, 15 Vand.L.Rev. 83, 87 (1961). Before considering a complete reversal of priorities, the bankruptcy court would have been obliged to weigh the less drastic remedy of placing a culpable senior creditor on a plane of equality with junior creditors.

. Initially we found it somewhat troubling that Judge Galgay applied the language of Anderson to the Trustee, 4 B.R. at 69, rather than to himself. While it is surely necessary that a trustee should perform these duties, his having done so does not relieve the bankruptcy judge from repeating the process, giving appropriate weight to the recommendations of the trustee *606 and his counsel. However, Judge Galgay’s opinion shows that he thoroughly understood this.

. There has been much to-do about how far Judge Galgay’s opinion represented his independent analysis as distinguished from a rubber-stamping of the findings of fact and conclusions of law prepared by counsel for the Trustee. Judge Galgay expressed, 4 B.R. at 57, his awareness of the caution in United States v. El Paso Natural Gas Co., 376 U.S. 651, 656-67, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964), that trial courts should not slavishly follow one party’s proposed findings of fact and conclusions of law. He acknowledged having “adopted findings of fact and conclusions of law submitted by the Trustee for the reason that they accurately state and reflect the true state of the record” so that “[i]t would be a waste of judicial tíme on my part merely to rephrase proposed findings and conclusions so accurately stated.” Id. At our request the counsel for the Trustee has made available his proposed findings and conclusions, and we have compared them with Judge Galgay’s. We find that while Judge Galgay did adopt most of the Trustee’s proposed findings of fact, especially as to the terms of the settlement, almost verbatim, he prepared his own legal discussion, and appellants’ charge that the opinion was that of counsel rather than of the judge is a gross exaggeration.

. Additional amounts not in excess of 2 cents on the dollar might be paid if allowed fees and expenses amount to less than 2% of the face value of all debentures tendered.

. Judge Duffy noted, 20 B.R. at 189 n. 4, that appellants had “arguably failed to preserve their claims for appeal by not properly articulating or presenting them in the bankruptcy court”, but did not rely on this.

. An appeal was also taken by a number of debentureholders, all represented by Mr. Brewer, (No. 82-5021) which, because none of these debentureholders had earlier appealed from the bankruptcy court to the district court, was dismissed for lack of standing without prejudice to later motions by these debentureholders for leave to intervene. Seventeen of this group, led by Robert B. Yates, have been granted permission to intervene and have amplified appellants’ contention that the Bankruptcy Trustee’s counsel should have been disqualified, infra, pp. 612-613. Another nine, led by James Stephan, have been allowed to intervene and have alleged conflicts of interest on the part of United States Trust Co., successor indenture trustee for the 43A debentures, and its counsel. In addition, leave to intervene was granted to a faction of debentureholders, led by John Masse and represented by I. Walton Bad-er, who support the amended offer of settlement but oppose United States Trust Co.’s application for fees pursuant to that offer. United States Trust Co. has also been permitted to intervene in support of the amended offer and in defense of its own conduct and that of its counsel.
The Stephan intervenors point to alleged conflicts of interest arising out of United States Trust Co.’s desire to obtain fees for its services and its potential liability for breaches of fiduciary duty committed by its predecessor Chase. We see no basis for the charges of misconduct leveled by the intervenors against United States Trust Co. and its counsel.

. As the transaction was conceived, Grant would use for repurchase of subordinated debentures so much of the proceeds as was needed to have the resulting paper reduction in subordinated debt on the right hand side of Grant’s balance sheet offset the loss of assets on the left hand side engendered by the discounted sale of the accounts receivable.

. We see no basis whatever for any claims against U.S. Trust or its counsel, supra, note 12.

. It would appear that the bank claimants had already acted to set-off $94,523,110 of Grant’s funds on deposit with them and to advance back $90,300,000 of this amount to Grant as debtor-in-possession by October 2, 1975, prior to the start of WGM’s challenged five-day representation of the bank claimants.